25 F.3d 1389
 UNITED STATES of America, Appellee,
v.
Delano Eugene MAXWELL, Appellant.
UNITED STATES of America, Appellee,
v.
Hassan MAJIED, Appellant.
American Civil Liberties Union; Nebraska Civil Liberties
Union; National Association of Criminal Defense
Lawyers, Amicus on Behalf of Appellant.
UNITED STATES of America, Appellee,
v.
Chester DAVIS, Appellant.
UNITED STATES of America, Appellee,
v.
Martin LEWIS, Appellant.
UNITED STATES of America, Appellant,
v.
Delano Eugene MAXWELL, Appellee,
v.
UNITED STATES of America, Appellant,
v.
Hassan MAJIED, Appellee.
UNITED STATES of America, Appellant,
v.
Martin LEWIS, Appellee.
American Civil Liberties Union; Nebraska Civil Liberties
Union; National Association of Criminal Defense
Lawyers, Amicus on Behalf of Appellee.
United States of America, Appellant,
v.
Chester Davis, Appellee.
 Nos. 93-2990, 93-2992, 93-3053, 93-3057, 93-3183.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 17, 1994.
Decided May 26, 1994.
 
 Alan G. Stoler, Omaha, NE, argued (William L. Kutmus, Des Moines, IA, on the brief, for appellant Maxwell; Alan G. Stoler, Omaha, NE, on the brief, for appellant Majied), for appellants Delano Maxwell and Hassan Majied.
 Brent M. Bloom, Omaha, NE, on the brief, for appellant Martin Lewis.
 W. Russell Bowie, Omaha, NE, on the brief, for appellant Chester Davis.
 Victor A. Bolden, Christopher A. Hansen, New York City, for amicus curiae, American Civ. Liberties Union Foundation; Lawrence J. Fleming, St. Louis, MO, for amicus curiae, Nat. Ass'n of Crim. Defense Lawyers; Dorothy Walker, for amicus curiae, Nebraska Civ. Liberties Union; on the brief, for appellant Hassan Majied.
 William W. Mickle, Omaha, NE, argued (Thomas J. Monaghan, William W. Mickle, II and Daniel A. Morris, on the brief), for appellee U.S.
 Before McMILLIAN, WOLLMAN, and MAGILL, Circuit Judges.
 WOLLMAN, Circuit Judge.
 
 
 1
 Chester Davis, Martin Lewis, Hassan Majied, and Delano Maxwell ("the defendants") appeal their convictions and sentences for drug-related offenses. The government cross appeals the district court's downward departure from the applicable sentencing ranges. We affirm the convictions, vacate the sentences, and remand to the district court for resentencing.
 
 I. Background
 
 2
 On September 22, 1989, Luther Bass telephoned Omaha Police Division Narcotics Officer Bruce Ferrell, telling Ferrell that some of Bass's friends who were selling cocaine had attempted to entice him to sell cocaine with them. Three days later, Bass met with Ferrell and identified to Ferrell the individuals whom Bass suspected of distributing cocaine. Based upon the information that Bass provided, officers began an investigation. Bass agreed to cooperate in the investigation by making controlled purchases of cocaine from the suspects and having conversations with them, which officers recorded. As part of the investigation, officers also conducted physical surveillance and installed pen registers on the suspects' telephones. A state court judge signed an order authorizing officers to intercept conversations over Majied's telephone. Officers used the intercepted telephone conversations as well as other information that they had obtained during their investigation to prepare applications for warrants to search the suspects' residences. The warrants were executed on December 19, 1989.
 
 
 3
 During their investigation, officers discovered that various individuals, including Lewis and Davis, were selling cocaine base in the vicinity of an Omaha housing project. Majied supplied these individuals with the cocaine, and Maxwell, who lived in Des Moines, Iowa, was Majied's source of cocaine.
 
 
 4
 The defendants were indicted for conspiring to distribute and possess with intent to distribute cocaine or a substance or mixture which contained cocaine base ("crack cocaine"), in violation of 21 U.S.C. Secs. 841(a)(1) and 846, and for various substantive crimes committed in furtherance of the conspiracy. Jason Calvert and Kelvin Moore were also charged in the indictment. They entered into plea agreements with the government and testified at the defendants' trial.
 
 
 5
 The defendants raise numerous issues on appeal, including the district court's denial of motions to suppress evidence and the sufficiency of the evidence supporting their convictions. They also challenge on various grounds the sentences that the district court imposed.
 
 II. Suppression Issues
 A. Wiretap Evidence
 
 6
 The defendants contend that the district court erred in refusing to suppress the evidence obtained from the wiretap placed on Majied's phone. They first argue that the evidence should have been suppressed because the wiretap recordings were not sealed immediately upon termination of the authorization.
 
 
 7
 Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. Sec. 2510-2520, sets forth the procedures that law enforcement officers are to follow when using electronic surveillance, including wiretaps, during the course of an investigation. Section 2518(8)(a) requires that "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." If the recordings are not sealed immediately and the government cannot provide a satisfactory explanation for the delay, the contents of the recordings and all of the evidence derived therefrom must be suppressed. United States v. Feiste, 961 F.2d 1349, 1350 (8th Cir.1992) (quoting 18 U.S.C. Sec. 2518(8)(a)). To provide a satisfactory explanation, the government must explain not only why a delay in sealing occurred but also why the delay is excusable. United States v. Ojeda Rios, 495 U.S. 257, 264, 110 S.Ct. 1845, 1850, 109 L.Ed.2d 224 (1990).
 
 
 8
 Pursuant to Title III, law enforcement officers presented to a judge an affidavit and application for authorization to intercept telephone conversations over Majied's telephone, and the judge signed an order authorizing the wiretap. On December 21, 1989, the issuing judge signed an order terminating the authorization. The wiretap recordings were sealed on December 28, 1989. The defendants argue that the district court should have granted their motion to suppress because the government did not adequately explain the seven-day delay in sealing. The district court, however, found that the government had offered a satisfactory explanation: the issuing judge's schedule. We review the district court's factual findings on a motion to suppress for clear error. United States v. Sawyers, 963 F.2d 157, 159 (8th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 619, 121 L.Ed.2d 552 (1992). Whether the government's explanation is satisfactory is a question of law that we review de novo. Id.
 
 
 9
 Having reviewed the record, we conclude that the district court's finding that it was the issuing judge rather than the government who specified the date for sealing is not clearly erroneous. On December 21, 1989, the same day that the authorization was terminated, the member of the Douglas County Attorney's office who was responsible for the wiretaps requested that the issuing judge set a date for sealing, and the judge chose December 28, 1989. In addition to conflicts in his schedule, the judge had to consider the 1989 Christmas holiday as well as an intervening weekend. Intervening weekends, holidays, and the unavailability of the issuing judge are satisfactory explanations for slight delays in presenting wiretap recordings for sealing. See, e.g., United States v. Pedroni, 958 F.2d 262, 266 (9th Cir.1992) (issuing judge's unavailability and decision when to schedule sealing constitute a satisfactory explanation); United States v. Ardito, 782 F.2d 358, 362-63 (2d Cir.) (two-day intervening holiday, unavailability of issuing judge, and need to prepare paperwork provided adequate explanation for five-day delay), cert. denied, 475 U.S. 1141, 106 S.Ct. 1792, 90 L.Ed.2d 338, and, 476 U.S. 1160, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986). Accordingly, the district court properly overruled the defendants' motion to suppress on the ground that the government did not adequately explain the delay in sealing the wiretap recordings.
 
 
 10
 The defendants also argue that the wiretap evidence should have been suppressed because the application did not establish that other investigative techniques had been unsuccessful. Title III requires that applications for electronic surveillance include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. Sec. 2518(1)(c). "Whether the statutory requirement is met is to be determined by the issuing judge in a commonsense manner, and the determination is a finding of fact, which can be reversed only if clearly erroneous." United States v. Macklin, 902 F.2d 1320, 1327 (8th Cir.1990), cert. denied, 498 U.S. 1031, 111 S.Ct. 689, 112 L.Ed.2d 680 (1991).
 
 
 11
 Section 2518(1)(c) requires a showing of necessity "to insure that wiretaps are not routinely employed as the initial step in an investigation." Id. at 1326. The comprehensive affidavit accompanying the wiretap application explained various investigative techniques that officers had used during the two-month period between Bass's call to Ferrell and the wiretap application. For example, Bass cooperated with law enforcement officers, providing them with information and attempting to make controlled drug purchases from the suspects. Officers conducted physical surveillance of the individuals whom Bass had identified and placed pen registers on their telephones. As the defendants point out, some of the investigative techniques provided the officers with useful information. Even if conventional techniques have been somewhat successful, however, a wiretap may still be authorized. United States v. O'Connell, 841 F.2d 1408, 1415 (8th Cir.), cert. denied, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988), and, 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989). Although Section 2518(1)(c) requires that other investigative techniques be used first, it does not require that officers exhaust those techniques before applying for a wiretap. Macklin, 902 F.2d at 1326. Officers had not been able to determine from other investigative methods the scope of the suspected conspiracy or to develop enough evidence to successfully prosecute the suspects whom they had identified. See id. at 1327 (holding that section 2518(1)(c) necessity requirement satisfied when normal investigative procedures failed to reveal scope of conspiracy and all persons involved). We conclude therefore that the issuing judge did not clearly err in determining that a wiretap was necessary, as required by section 2518(1)(c), and that the intercepted evidence should not be suppressed.
 
 B. Knock and Announce
 
 12
 Davis argues that the district court erred in refusing to suppress evidence seized from his residence by law enforcement officers who failed to comply with the "knock and announce" requirements set forth in 18 U.S.C. Sec. 3109. Section 3109 requires that law enforcement officers knock, announce their purpose, and be refused entry before forcibly entering a residence to execute a search warrant. The government concedes that the officers forced entry into Davis's residence without knocking and announcing their purpose. Adopting the magistrate judge's report and recommendation, however, the district court found that exigent circumstances, specifically the officers' fear for their safety, excused their otherwise improper entry. In considering the district court's decision with respect to section 3109, we review the district court's findings of fact for clear error and its application of law de novo. United States v. Schenk, 983 F.2d 876, 879 (8th Cir.1993).
 
 
 13
 Noncompliance with the requirements of section 3109 will be excused if exigent circumstances justify the unannounced entry. Sabbath v. United States, 391 U.S. 585, 591 n. 8, 88 S.Ct. 1755, 1759 n. 8, 20 L.Ed.2d 828 (1968); United States v. Keene, 915 F.2d 1164, 1168 (8th Cir.1990), cert. denied, 498 U.S. 1102, 111 S.Ct. 1001, 112 L.Ed.2d 1084 (1991). Such exigent circumstances exist when law enforcement officials are aware of facts that indicate that knocking and announcing their presence might endanger their safety. United States v. Lucht, 18 F.3d 541, 549 (8th Cir.1994). The officer who led the entry into Davis's residence testified at the suppression hearing that he had been concerned for his safety and the safety of the other officers as he approached the residence. Based upon our review of the record, we conclude that the district court did not clearly err in finding that the officer's fear was justified. In a briefing immediately before the search, the officers were informed that Davis recently had purchased a .25 caliber handgun. Moreover, the officers knew that Davis had a propensity for violence, for they were aware that he had a prior felony conviction for assault with the use of a weapon, and they had intercepted telephone conversations in which Davis discussed assaults that he had committed. They also knew that Davis had associations with a gang which had a reputation for violence. Accordingly, we conclude that the officers' fear for their safety constituted an exigent circumstance excusing compliance with the knock and announce requirements of section 3109, and we therefore affirm the district court's denial of Davis's motion to suppress.
 
 III. Sufficiency of the Evidence
 
 14
 Lewis and Davis argue that the evidence was insufficient to support their convictions. When considering a sufficiency-of-the-evidence claim, we view the evidence in the light most favorable to the government, giving it the benefit of all favorable inferences. United States v. Matra, 841 F.2d 837, 840 (8th Cir.1988). We will reverse a conviction only if we apply the above standard and conclude "that a reasonable fact-finder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements." United States v. Ivey, 915 F.2d 380, 383 (8th Cir.1990).
 
 
 15
 To convict a defendant of conspiracy, the government must prove that "there was an agreement to achieve some illegal purpose, that the defendant knew of the agreement, and that the defendant knowingly became a part of the conspiracy." United States v. Rogers, 982 F.2d 1241, 1244 (8th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 3017, 125 L.Ed.2d 706 (1993).
 
 
 16
 We examine first the evidence to determine whether the government established an agreement to distribute cocaine or cocaine base. Such agreement need not be express or formal, United States v. Watson, 952 F.2d 982, 988 (8th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1694, 118 L.Ed.2d 406 (1992), and the government does not have to show any more than a tacit understanding among the participants. United States v. Hernandez, 986 F.2d 234, 238 (8th Cir.1993). Because of the secrecy inherent in a drug conspiracy, the agreement must often be established by way of inference from the surrounding circumstances. Ivey, 915 F.2d at 384.
 
 
 17
 After reviewing the record, we conclude that a reasonable jury could have found an agreement to distribute cocaine or cocaine base. Viewed in the light most favorable to the government, the evidence established that Maxwell supplied cocaine to Majied. Majied then provided cocaine to various individuals who distributed it, sharing the profits with Majied. Mack Brown, whom Omaha police officers arrested in October 1989, identified Maxwell as Majied's cocaine source. Informing Bass how easily he was able to make large sums of money, Majied attempted to recruit Bass to distribute cocaine for him during the summer and fall of 1989. Often, other individuals accompanied Majied and assisted in attempting to recruit Bass. At one point, Majied told Bass that he had earned enough money to purchase a car from selling drugs and from people selling drugs for him. Majied accepted $2500 from Bass so that Bass could be part of Majied's "one last big buy," and Majied identified to Bass other individuals who were participating in the transaction.
 
 
 18
 The conspiracy established, the question then is whether the evidence was sufficient to establish that Lewis and Davis were part of the conspiracy. "Once a conspiracy is established, even slight evidence connecting a defendant to the conspiracy may be sufficient to prove the defendant's involvement." Ivey, 915 F.2d at 384. When Calvert was selling cocaine base in the housing project, he saw Lewis in the area, walking up and down the street and occasionally approaching and remaining next to a car for five to ten minutes. Lewis was with Majied on one of the occasions in the late summer of 1989 when Majied attempted to convince Bass to distribute cocaine. Twice Bass saw Majied distribute cocaine to Lewis. In some of the intercepted telephone conversations, Lewis and Majied discussed the money that Lewis owed Majied. In fact, Majied told Lewis that he would give him "one of those free" if Lewis paid him the next morning. We find this evidence sufficient for a reasonable jury to conclude that Lewis was involved in the conspiracy.
 
 
 19
 The evidence was also sufficient for a reasonable jury to find that Davis was involved in the conspiracy. On November 22, 1989, Davis accompanied Majied on a trip to Maxwell's apartment in Des Moines. The purpose of the trip was to pick up drugs. In many of the intercepted conversations, Davis and Majied discussed the money that Davis owed Majied. Additionally, when officers searched Davis's residence on December 19, 1989, they seized a police scanner and two pagers. An Omaha police officer who trains recruits in the area of undercover narcotics investigations testified that such items are often used by those distributing controlled substances.
 
 IV. Sentencing Issues
 
 20
 All of the defendants appeal their sentences, challenging the constitutionality of 21 U.S.C. Sec. 841 and section 2D1.1 of the Sentencing Guidelines.[1] Davis, Lewis, and Maxwell also argue that the district court erroneously calculated their base offense levels, and Majied, Davis, and Maxwell contend that the district court improperly enhanced their offense levels. The government cross appeals the district court's downward departure from the applicable sentencing ranges.
 
 
 21
 A. Constitutionality of 21 U.S.C. Sec. 841 and U.S.S.G. Sec. 2D1.1
 
 
 22
 All of the defendants argue that the district court erred in denying their constitutional challenge to 21 U.S.C. Sec. 841 and U.S.S.G. Sec. 2D1.1. We disagree.
 
 
 23
 Relying on statistics that they presented at the sentencing hearing, the defendants contend that the challenged provisions, which provide for the 100:1 ratio between sentences for cocaine base and cocaine powder, have a disparate impact on African Americans. The defendants argue that we therefore should apply a strict scrutiny standard of review and find the provisions violative of the constitutional principle of equal protection. The defendants, however, recognize that we consistently have held that the challenged provisions do not deny equal protection of the law because there is no evidence that Congress or the Sentencing Commission had a racially discriminatory purpose when they enacted more severe sentences for cocaine base. See, e.g., United States v. Simms, 18 F.3d 588, 595 (8th Cir.1994); United States v. Womack, 985 F.2d 395, 400 (8th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 276, 126 L.Ed.2d 227 (1993); United States v. Lattimore, 974 F.2d 971, 975-76 (8th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993). Thus, the defendants argue that it is the continued enforcement rather than the enactment of the challenged provisions that is unconstitutional.
 
 
 24
 In support of their argument, however, the defendants have offered only statistical and anecdotal evidence concerning the racially disparate impact of the 100:1 ratio. As we stated in Lattimore, such "numbers do not indicate a violation of equal protection in the federal constitutional sense." 974 F.2d at 975. "[E]ven if a neutral law has a disproportionately adverse impact upon a racial minority, it is unconstitutional ... only if that impact can be traced to a discriminatory purpose." Personnel Administrator of Mass. v. Feeney, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). The defendants presented no evidence that Congress or the Sentencing Commission has permitted the challenged provisions to remain in effect "at least in part because of, not merely in spite of, [their] adverse effects upon" a racial minority. United States v. Johnson, 12 F.3d 760, 763-64 (8th Cir.1993) (internal quotations omitted). Accordingly, we reject the defendants' equal protection challenge to the disparity in the Guidelines between cocaine base and cocaine powder. See United States v. Willis, 967 F.2d 1220, 1225 (8th Cir.1992) (rejecting equal protection challenge to more severe cocaine base penalties because there is no evidence that Congress permitted them to remain in effect to further a racially discriminatory purpose).
 
 B. Base Offense Level
 
 25
 Under the Guidelines, a defendant's base offense level for drug crimes is calculated according to the identity and quantity of controlled substance attributable to the defendant. See U.S.S.G. Sec. 2D1.1. The government must establish by a preponderance of the evidence both the type and quantity of drug attributable to each defendant. United States v. Monroe, 978 F.2d 433, 435 (8th Cir.1992) (drug type); United States v. Simmons, 964 F.2d 763, 771 (8th Cir.) (drug quantity), cert. denied, --- U.S. ----, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992). We review the district court's findings as to the quantity and identity of drugs attributable to a defendant for clear error, reversing only if we are left with a definite and firm conviction that a mistake has been made. United States v. Adipietro, 983 F.2d 1468, 1472 (8th Cir.1993).
 
 
 26
 Claiming that the district court erred in determining both the identity and quantity of the controlled substance for which they were responsible, Davis, Lewis, and Maxwell challenge the district court's determination of their base offense levels.
 
 
 27
 We first consider the district court's determination that the substance for which the defendants were responsible was cocaine base rather than cocaine powder. The defendants argue that the cocaine was often in powder form when Maxwell and Majied distributed it and that they therefore should not be held accountable for cocaine base. While Maxwell and Majied sometimes distributed cocaine powder, they distributed it to other members of the conspiracy who then converted it into cocaine base. When Lewis, Calvert, Moore, and Davis sold cocaine in the vicinity of the housing project, it was in the form of cocaine base. Maxwell and Majied were aware that their coconspirators were converting the powder to cocaine base before distributing it. In fact, Majied provided his coconspirators with directions for converting powder cocaine to cocaine base. Accordingly, the district court did not clearly err in holding all of the conspirators accountable for cocaine base since that was the form in which the cocaine was finally distributed to persons outside of the conspiracy.
 
 
 28
 Having decided that the district court did not erroneously determine the identity of the controlled substance for which the defendants were responsible, we must next decide whether the court's quantity determination was proper. In determining a defendant's base offense level, the district court must consider all such acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. Sec. 1B1.3(a)(2). Because the government seized only a small amount of drugs, the district court approximated the quantity of drugs attributable to each defendant. Id. Sec. 2D1.1, comment. (n. 12). In making such an approximation, factors that the court may consider include "the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved." Id.
 
 
 29
 The district court found that Davis was responsible for between 50 and 150 grams of cocaine base. In his brief Davis concedes that intercepted telephone conversations refer to at least $1,925 that Davis owed to Majied. At the sentencing hearing, Moore testified that Majied charged $2300 to $2400 per ounce (28.35 grams, see U.S.S.G. Sec. 2D1.1, comment. (n. 10)) of cocaine. As Majied's coconspirator, however, Davis is also responsible for Majied's sales to other people if those sales were in furtherance of the conspiracy and were reasonably foreseeable to Davis. Id. Sec. 1B1.3(a)(1)(B). During October and November 1989, Majied sold more than 100 grams of cocaine to Moore. Majied was also selling cocaine to Lewis and Calvert during this period. Based upon this evidence, we conclude that the district court did not clearly err in finding that Majied's distribution of cocaine to others was reasonably foreseeable to Davis and that Davis therefore was responsible for at least 50 grams of cocaine base.
 
 
 30
 The district court found that Lewis was accountable for between 50 and 150 grams of cocaine base. At the sentencing hearing, Bass testified that he saw Majied distribute to Lewis a quarter of an ounce of cocaine base and a quarter of an ounce of cocaine powder. These two distributions account for approximately fourteen grams of cocaine. Lewis is also responsible for the cocaine that Majied distributed to other people if those amounts were in furtherance of the conspiracy and were reasonably foreseeable to Lewis. As we have noted, Davis owed Majied money for at least twenty grams of cocaine and Majied sold more than one hundred grams to Moore. The district court's finding that it was reasonably foreseeable to Lewis that Majied was distributing cocaine to others is not clearly erroneous. Moore and Calvert both testified that Lewis was often in the housing project when they were there selling cocaine base for Majied. Additionally, Lewis was present when Majied tried to give Bass cocaine to sell.
 
 
 31
 We have considered Lewis's other arguments regarding the district court's drug quantity determination and find them to be without merit. Accordingly, we find that the district court did not err in determining that Lewis was accountable for 50 to 150 grams of cocaine base.
 
 
 32
 Maxwell argues that the district court erred in determining that he was accountable for at least 500 grams of cocaine base. The court based its finding on the 13.65 grams of cocaine, which officers seized from Brown's apartment, that Maxwell had supplied to Brown and the 84 grams of cocaine base and the 1085 grams of cocaine powder[2] that Brown testified that Maxwell had supplied to him during the summer of 1989. Additionally, because Maxwell had supplied Majied with the cocaine that he distributed, the court relied on the 429 grams of cocaine that Majied had supplied to Moore. The record supports these findings. Accordingly, we find that the district court's drug quantity determination is not clearly erroneous.
 
 C. Enhancements
 1. Weapon Enhancement
 
 33
 Davis, Majied, and Maxwell argue that the district court erroneously enhanced their base offense levels for possessing firearms during the course of a drug offense. Section 2D1.1(b)(1) of the Sentencing Guidelines provides for a two-level increase if a firearm was possessed during the commission of a drug offense. "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. Sec. 2D1.1(b)(1), comment. (n. 3). We will reverse the district court's finding that a defendant possessed a firearm during the commission of a drug offense only for clear error. United States v. Luster, 896 F.2d 1122, 1128 (8th Cir.1990).
 
 
 34
 When officers executed a search warrant at Davis's residence, they found a .25 caliber semi-automatic pistol at the back of a homemade stereo speaker cabinet. On top of the speaker, they found Davis's social security card, birth certificate, and Nebraska identification card. Although the pistol was not loaded, officers found it near a portable police scanner and two pagers. Moreover, officers intercepted a telephone conversation in which Davis informed Majied, who supplied Davis with cocaine, that he had purchased the pistol. Accordingly, we conclude that the district court did not clearly err in finding that it was not improbable that the firearm was connected with the drug conspiracy.
 
 
 35
 When officers searched Maxwell's apartment, they seized two weapons: a loaded .22 caliber eight-shot revolver in a holster and a 12-gauge single barrel shotgun with a cylinder-shaped magazine which held twelve rounds. They also seized $4,000 in traveler's checks and more than $8,000 in currency. Although Maxwell admitted that the weapons were his, he argues that the district court erred in enhancing his sentence because the government failed to prove a sufficient nexus between the drug offense of conviction and his possession of the weapons. We disagree.
 
 
 36
 Officers found the revolver on the headboard of Maxwell's bed next to $5,000 in currency. Maxwell claims that the shotgun was for hunting, but he admitted that he had never been hunting. Although the officers did not seize any drugs from Maxwell's apartment, he sometimes stored cocaine there, and it had been the site of drug transactions. Brown testified that he went to Maxwell's apartment and gave Maxwell $1,000 in exchange for one-half ounce of cocaine. Maxwell cut the cocaine off a twelve-inch-long block of cocaine that he had retrieved from a kitchen cabinet. Additionally, Majied twice went to Maxwell's apartment to pick up drugs. We therefore conclude that the district court committed no error in finding that it was not clearly improbable that the weapons were connected with the drug offense. See United States v. Pou, 953 F.2d 363, 371 (8th Cir.) (finding connection between weapons seen in an apartment from which cocaine was distributed and drug offense more than adequate to apply enhancement), cert. denied, --- U.S. ----, ----, and, ----, 112 S.Ct. 1982, 1982, and, 1983, 118 L.Ed.2d 580, 118 L.Ed.2d 581 (1992).
 
 
 37
 Calvert testified that he saw Majied waving a nine-millimeter semi-automatic pistol in the fall of 1989. As Majied notes, mere presence of a firearm is not sufficient to apply the enhancement. United States v. Khang, 904 F.2d 1219, 1223 (8th Cir.1990). We find, however, that the government has met its burden of establishing that it was not clearly improbable that the firearm was connected to a drug offense. Calvert saw Majied with the pistol in the housing project where Lewis, Moore, Davis, and Calvert sold the cocaine base which Majied had supplied to them. Accordingly, the district court did not clearly err in enhancing Majied's sentence.
 
 2. Role in the Offense Enhancement
 
 38
 Maxwell challenges the district court's four-level enhancement in his offense level for his aggravating role in the offense. Guidelines section 3B1.1(a) provides that a defendant's offense level should be increased by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The district court's determination of a participant's role in the offense is a factual finding that we review for clear error. United States v. Nelson, 988 F.2d 798, 809 (8th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 302, 126 L.Ed.2d 250 (1993).
 
 
 39
 We have broadly interpreted the terms "organizer" and "leader." See, e.g., United States v. Horne, 4 F.3d 579, 590 (8th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1121, 127 L.Ed.2d 430 (1994). In addition, a defendant can be a leader or organizer within the meaning of section 3B1.1(a) even if he did not directly control others in the conspiracy. United States v. Ortiz-Martinez, 1 F.3d 662, 677 (8th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 355, 126 L.Ed.2d 319 (1993). Maxwell was Majied's source of cocaine. Majied then supplied Moore, Lewis, Davis, and Calvert with the cocaine that they distributed in the housing project. See United States v. Greene, 995 F.2d 793, 801-02 (8th Cir.1993) (upholding four-level enhancement based upon evidence that defendant distributed marijuana in large quantities directly or through an intermediary to four individuals). In addition, many of the intercepted telephone conversations were calls from Maxwell to Majied to determine whether Majied had encountered any problems. Accordingly, we find that the district court did not clearly err by determining that Maxwell was a leader or organizer.
 
 3. Obstruction of Justice Enhancement
 
 40
 Maxwell also challenges the enhancement of his offense level for obstruction of justice. Guidelines section 3C1.1 provides for a two-level enhancement "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." The provision is not "intended to punish a defendant for the exercise of a constitutional right." U.S.S.G. Sec. 3C1.1, comment. (n. 1). If the defendant commits perjury, however, he has obstructed justice, and the enhancement applies. Id. Sec. 3C1.1, comment. (n. 3); see also United States v. Dunnigan, --- U.S. ----, ---- - ----, 113 S.Ct. 1111, 1117-18, 122 L.Ed.2d 445 (1993) (upholding the constitutionality of a two-level upward adjustment for obstruction of justice pursuant to section 3C1.1 based on the district court's specific finding that the defendant's trial testimony constituted perjury). After reviewing all of the evidence concerning Maxwell's involvement in the distribution of cocaine, the district court found that Maxwell had committed perjury by testifying that he had never possessed or distributed cocaine. We have reviewed the record and do not find the district court's credibility determination clearly erroneous. Thus, we reject Maxwell's challenge to the obstruction of justice enhancement. See, e.g., United States v. Marx, 991 F.2d 1369, 1375 (8th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 618, 126 L.Ed.2d 582 (1993).
 
 D. Downward Departure
 
 41
 The government cross appeals from the district court's downward departure from the applicable Guidelines ranges, pursuant to 18 U.S.C. Sec. 3553(b) and U.S.S.G. Sec. 5K2.0, p.s. The district court departed downward on the ground that the 100:1 ratio between cocaine powder and cocaine base in the Guidelines has disparately impacted African Americans, finding that "[t]his disparate impact was not contemplated by Congress nor was it considered by the Sentencing Commission in developing the guideline ranges for users of crack cocaine." United States v. Majied, No. 8:CR91-00038(02), 1993 WL 315987 (D.Neb. July 29, 1993) (Judgment Including Sentence Under the Sentencing Reform Act, Statement of Reasons for Departure).
 
 
 42
 A sentencing court may impose a sentence that is not within the applicable Guidelines range if the court "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. Sec. 3553(b). Whether the circumstance upon which the district court relies to depart is of a kind or degree that may appropriately be relied upon to justify departure is a question of law that we review de novo. United States v. Passmore, 984 F.2d 933, 936 (8th Cir.1993) (quoting United States v. Thomas, 914 F.2d 139, 143-44 (8th Cir.1990)).
 
 
 43
 A downward departure is not justified simply because the Sentencing Commission did not take a factor into consideration. "[A]n asserted ground for departure must be not only one that the Commission did not adequately consider, but also one for which a sentence outside the guidelines 'should result.' " United States v. Bynum, 3 F.3d 769, 774 (4th Cir.1993) (citing 18 U.S.C. Sec. 3553(b)), cert. denied, --- U.S. ----, 114 S.Ct. 1105, 127 L.Ed.2d 416 (1994). In United States v. Lattimore, the district court noted the potentially racially disparate impact of the cocaine-base Guidelines in explaining the grounds for its downward departure. 974 F.2d 971, 973 (8th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993). In response, we stated that it is for either Congress or the Sentencing Commission, not the courts, to determine whether a racially disparate impact mandates a change in the Guidelines. Id. at 976. "Our job is to decide whether the Guidelines or the statute run counter to equal-protection principles in the constitutional sense." Id. In the present case, we have rejected the defendants' equal protection challenge because they presented no evidence of racial animus towards African Americans in the adoption or the continued enforcement of the harsher cocaine-base penalties. Accordingly, we reiterate that while a racially disparate impact may be a serious matter, it is not a matter for the courts, id., and, therefore, not a basis upon which a court may rely to impose a sentence outside of the applicable Guidelines range.
 
 
 44
 Congress specifically intended to provide more severe penalties for cocaine base than those for cocaine powder, and we have held that Congress's decision to do so was rationally related to its "objective of protecting the public welfare." United States v. Buckner, 894 F.2d 975, 980 (8th Cir.1990); see also United States v. Williams, 982 F.2d 1209, 1213 (8th Cir.1992). The defendants contend, however, that a class of cocaine base offenders, specifically African Americans, should receive sentences that are not as harsh as those that Congress intended. We disagree. See United States v. Prestemon, 929 F.2d 1275, 1277 (8th Cir.1991) (holding that a defendant's race cannot be a basis for departure), cert. denied, --- U.S. ----, 112 S.Ct. 220, 116 L.Ed.2d 178 (1991). Congress provided for more severe penalties for all, not merely some, cocaine base offenders.
 
 
 45
 In United States v. Bynum, the Fourth Circuit held that the Sentencing Commission's failure to consider the disparate impact of the 100:1 ratio is not a ground for downward departure. 3 F.3d 769, 774-75 (4th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1105, 127 L.Ed.2d 416 (1994). The court reasoned that a downward departure based on a racially disparate impact will ultimately result in "class-wide downward departures" and impede Congress's policy decision to treat cocaine base more harshly than powder cocaine. Id. In light of this reasoning and our holding in Lattimore, we conclude that the disparate impact of the 100:1 ratio is not a proper basis for downward departure. See also United States v. Haynes, 985 F.2d 65, 70 (2d Cir.1993) (holding that "the harsher penalties for crack crimes present no basis for downward departure.").
 
 
 46
 Accordingly, we affirm the defendants' convictions, vacate their sentences, and remand the cases to the district court for resentencing within the applicable Guidelines ranges.
 
 
 
 [1]
 All references are to the November 1992 Guidelines Manual
 
 
 [2]
 Although a large portion of the cocaine that Maxwell distributed to Brown was in powder form, the district court held Maxwell accountable for cocaine base. The district court committed no error in doing so, however. Brown informed Maxwell of his intent to convert into cocaine base all of the cocaine powder that Maxwell supplied to him