# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3905

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Brian K. Thompson, also known as | * | |
| Brian Keith Thompson, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: January 11, 2000

Filed: April 28, 2000

_____

Before WOLLMAN, Chief Judge, FLOYD R. GIBSON, and MURPHY,
Circuit Judges.

_____

WOLLMAN, Chief Judge.

Brian K. Thompson appeals from his conviction on numerous drug trafficking
and money laundering charges and from the resulting sentence imposed by the district
court.[1]  We affirm.

---

[1]The Honorable Howard F. Sachs, United States District Judge for the Western
District of Missouri.

**I.**

Thompson's conviction stems from an investigation by federal and state authorities into a drug distribution and money laundering scheme centered in Kansas City, Missouri. Authorities first learned of Thompson's involvement in the scheme in late 1994 through an undercover investigation conducted by Special Agent Albert Pisterzi of the Federal Bureau of Investigation (FBI). Pisterzi discovered that Thompson had been heavily involved in narcotics distribution since at least 1989 and was currently distributing 10 to 50 kilograms of cocaine per month. Pisterzi also obtained firsthand knowledge of Thompson's drug activity, meeting with him several times in 1994 to discuss drug transactions and purchasing cocaine from him in November of that year.

Despite their knowledge of Thompson's illicit conduct, authorities did not arrest him in 1994. Instead, they continued to investigate Thompson and other suspected drug traffickers in an attempt to ascertain the full extent of the conspiracy, using physical surveillance, confidential informants, controlled drug buys, pen registers, and other investigative techniques. On November 10, 1997, the FBI, believing that these methods were insufficient to expose the full conspiracy, filed an application pursuant to 18 U.S.C. § 2518 for an order authorizing the interception of communications made on Thompson's telephone. The district court[2] issued the order, and over the next several weeks the FBI recorded conversations between Thompson and other alleged conspirators. Several of these discussions contained incriminating statements by Thompson that were used against him at trial.

Apparently satisfied that they had exposed the entire conspiracy, authorities arrested Thompson on December 12, 1997, citing his 1994 sale of cocaine to Pisterzi

---

[2]The Honorable D. Brook Bartlett, late the Chief Judge, United States District Court for the Western District of Missouri.

as the basis for the arrest. Shortly thereafter, search warrants were executed at Thompson's residence, his mother's residence, an automobile dealership with which Thompson was affiliated, and three storage units controlled by Thompson. These searches yielded numerous items of evidence, including large quantities of cocaine and cash, numerous weapons, a drug scale, a currency counting machine, expensive automobiles, jewelry, and other luxury items.

Thompson was charged with conspiracy to possess and distribute cocaine and marijuana, five counts of distributing cocaine and marijuana, conspiracy to commit money laundering, five counts of money laundering, one count of possessing a firearm after a felony conviction, and one count of criminal forfeiture. Prior to trial, Thompson moved to suppress the wiretap evidence and the evidence seized from storage unit J11, one of the three storage units searched in December of 1997. The district court[3] denied the motions. On June 12, 1998, a jury found Thompson guilty on all counts. He was sentenced to life imprisonment and was ordered to pay a special assessment of $1,200,000 and a fine of $2,000,000.

## II.

Thompson first contends that we should set aside his conviction on three of the drug trafficking counts and all of the money laundering counts. He argues that the district court erroneously denied his motions to suppress the wiretap evidence and the evidence obtained from storage unit J11 and that, absent this evidence, there is insufficient evidence to support his conviction on these counts. We review the district

---

[3]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri. Judge Fenner adopted the recommendation and report of the Honorable Robert E. Larsen, United States Magistrate Judge for the Western District of Missouri, regarding the motion to suppress the wiretap evidence, and made independent findings regarding the motion to suppress the storage unit evidence.

court's denial of a motion to suppress de novo, and its factual findings for clear error. See United States v. Fairchild, 189 F.3d 769, 774 (8th Cir. 1999).

## A. Wiretap Evidence

Thompson contends that the wiretap evidence should have been suppressed because the application and affidavit used to secure the wiretap failed to establish the necessity for the wiretap that 18 U.S.C. § 2518(1)(c) requires. Section 2518(1)(c) provides that an application for an order authorizing a wiretap must include, among other things, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." This requirement seeks to insure "that wiretaps are not routinely employed as the initial step in an investigation," United States v. Maxwell, 25 F.3d 1389, 1394 (8th Cir. 1994) (quoting United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990)); it does not, however, require that law enforcement officers "exhaust all possible techniques before applying for a wiretap." United States v. Shaw, 94 F.3d 438, 441 (8th Cir. 1996) (quoting Macklin, 902 F.2d at 1326). The determination of the necessity for a wiretap is a finding of fact that is reviewed for clear error. See Maxwell, 25 F.3d at 1394.

Our review of the supporting affidavit convinces us that the FBI's wiretap application satisfies both the letter and the spirt of section 2518(1)(c). The affidavit recounts in detail the investigative procedures that authorities used during their two-year investigation of the conspiracy and explains why each of those methods failed to expose the full extent of the conspiracy. For example, the affidavit explains that physical surveillance was largely futile because Thompson was adept at evading authorities through the use of aliases and evasive driving tactics; pen registers were of limited use because Thompson registered his telephones in fictitious names and regularly changed telephone numbers; and cooperating informants were only minimally effective because all but one had ceased providing new information and the remaining

informant was unable to identify the primary drug supplier or other key conspirators. The affidavit also explains why other traditional measures, such as grand jury subpoenas and search warrants, were not used, stating that such methods were avoided because of a fear that they would alert unknown conspirators to the investigation and thus make them even more difficult to apprehend.

The affidavit therefore establishes that authorities had employed several traditional investigative techniques for more than two years before applying for a wiretap and that those methods were insufficient to reveal the full conspiracy or the identity of several key conspirators. Such facts are sufficient to support a district court's finding of necessity under section 2518(1)(c). See Maxwell, 25 F.3d at 1394 (necessity requirement met where affidavit established that conventional investigative procedures failed to reveal full conspiracy or sufficient evidence to prosecute identified conspirators); United States v. Smith, 909 F.2d 1164, 1166 (8th Cir. 1990) (necessity established where affidavit demonstrated that traditional procedures failed to expose full extent of conspiracy and all conspirators); Macklin, 902 F.2d at 1327 (same); United States v. O'Connell, 841 F.2d 1408, 1414-15 (8th Cir. 1988) (same).

Although Thompson correctly points out that many of the reasons given in the affidavit for the ineffectiveness of traditional investigative techniques are common to most drug conspiracy investigations, this fact does not necessarily preclude a finding of necessity under section 2518(1)(c). See United States v. Milton, 153 F.3d 891, 895 (8th Cir. 1998). In Milton, which also involved a challenge to the necessity for a wiretap used in a drug investigation, we noted that although the affidavit's assertions of inadequacy "might appear boilerplate, the fact that drug investigations suffer from common investigatory problems does not make these problems less vexing." Id. We then concluded that, even though the recited investigatory problems were unremarkable, the affidavit established necessity because it set forth in sufficient detail why the traditional investigative techniques would not prove successful in the circumstances presented by that case. See id.; see also Shaw, 94 F.3d at 441-42. The

-5-

same is true of this case, as the affidavit describes with particularity how the investigatory techniques traditionally used in drug investigations would not likely be successful in the investigation of the Kansas City-based conspiracy. The district court therefore did not clearly err in finding necessity under section 2518(1)(c).

## B. Storage Unit Evidence

Thompson also contends that the district court erroneously failed to suppress evidence that was seized from storage unit J11 pursuant to a warrant authorizing a search of the storage unit and the seizure of a white 1992 Dodge minivan, a vehicle that authorities had linked to the conspiracy. He argues that the warrant was invalid because the affidavits submitted to secure the warrant specifically stated that the 1992 Dodge minivan was located in J11, while the evidence upon which this statement was based, the testimony of Rick Jones, provided only that Jones saw Thompson drive a "white minivan" into J11. Thompson contends that the affiants were not entitled to infer that the vehicle referred to by Jones was the 1992 Dodge minivan and that absent this inference there was no probable cause to search storage unit J11, i.e., there was no reason to believe that J11 contained the 1992 Dodge minivan or any other contraband or evidence.

A warrant is supported by probable cause if "'there is a fair probability that contraband or evidence of a crime will be found' in the place to be searched." United States v. Mahler, 141 F.3d 811, 813 (8th Cir. 1998) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). Although it is well established that a judge may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, see United States v. Sundby, 186 F.3d 873, 875-76 (8th Cir. 1999); Mahler, 141 F.3d at 814, we have also recognized that law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant, see United States v. Callison, 577 F.2d 53, 54-55 (8th Cir. 1978) (upholding search warrant based on affidavit of officer who reasonably inferred that defendant whose car was

searched was a robbery suspect); cf. United States v. Fahsi, 102 F.3d 363, 365 (8th Cir. 1996) (officers' determination of probable cause to make warrantless arrest "requires officers to make reasonable inferences from facts known to them"); United States v. Sherrill, 27 F.3d 344, 347 (8th Cir. 1994).

After reviewing the information that was available to the affiants at the time they prepared their supporting affidavits, we are satisfied that it was reasonable for the affiants to infer that the 1992 Dodge minivan was located in storage unit J11. According to the affidavits, authorities obtained a seizure warrant on December 12, 1997, for a white 1992 Dodge minivan they had substantial reason to believe was involved in the conspiracy. Three days later, authorities interviewed Jones, a known associate of Thompson, who stated that Thompson often used J11 to store vehicles and that he had seen Thompson park a white minivan in that facility two weeks earlier. That same day, the manager of the storage facility stated that J11 was leased to Darrell Bostic, which authorities knew to be an alias used by Thompson, and that J11 contained a vehicle at that time. Thus, because a white 1992 Dodge minivan was linked to the conspiracy and because Thompson, an integral member of that conspiracy, was seen parking a white minivan in storage space J11, it was reasonable for the affiants to infer that these two vehicles were one and the same.

We therefore conclude that Thompson's motions to suppress evidence were properly denied and that his conviction on the challenged counts must thus stand.

**III.**

Thompson also challenges his sentence, contending that the district court improperly enhanced his offense level for his role in the offense, obstruction of justice, and the possession of a firearm in connection with a drug offense. These enhancements are based upon findings of fact, which we review for clear error. See United States v. Baker, 200 F.3d 558, 562 (8th Cir. 2000) (obstruction of justice); United States v.

Hernandez, 187 F.3d 806, 808 (8th Cir. 1999) (possession of a firearm); United States v. Simmons, 154 F.3d 765, 768 (8th Cir. 1998) (role in the offense).

## A.  Role in the Offense

Thompson first challenges the district court's enhancement for his role in the offense.  The court found that Thompson was an "organizer or leader of a criminal activity that involved five or more participants" and therefore imposed a four-level enhancement pursuant to U.S.S.G. § 3B1.1(a).  Thompson contends that such an enhancement was erroneous because there was insufficient evidence presented at trial from which the court could conclude that he was an organizer or leader of the conspiracy or any other criminal activity.

"The terms 'organizer' and 'leader' are to be broadly interpreted." United States v. Guerra, 113 F.3d 809, 820 (8th Cir. 1997).  Although an individual in a drug conspiracy must do more than sell drugs for resale in order to be deemed an organizer or leader, he need not directly control his co-conspirators. See id.  Among the factors to be considered in making this determination are the defendant's decision-making authority, the nature of his participation in the crime, whether he recruited accomplices, the degree of his participation in organizing the offense, and his control and authority over others.  See U.S.S.G. § 3B1.1, comment. (n.4); United States v. Rodriguez, 112 F.3d 374, 377 (8th Cir. 1997).

The evidence established that Thompson played a key role in both the channeling of vast quantities of drugs into Kansas City and the distribution of those drugs to various dealers within the city.  To promote the influx of narcotics into Kansas City, Thompson traveled to Texas to recruit a supplier, regularly organized the transport of large drug shipments from Texas, and often received and stored such shipments.  To facilitate the distribution of drugs in Kansas City, Thompson provided drugs to dealers on credit so that they could sell without first buying the drugs themselves, recruited at

least one person to deliver cocaine to those dealers, and controlled the price of the drugs he sold. In light of this evidence, there is no clear error in the district court's finding that Thompson was an organizer or leader of the conspiracy. See United States v. Brown, 148 F.3d 1003, 1005-06, 1008 (8th Cir. 1998) (defendant who coordinated purchase of drugs from suppliers and managed finances of drug conspiracy was organizer or leader); United States v. Knight, 96 F.3d 307, 310 (8th Cir. 1996) (defendant who was "key link" between drug suppliers and distributors, stored drug shipments, set prices, and had others deliver drugs on his behalf was organizer or leader).

## B. Obstruction of Justice

Thompson also contends that the district court improperly imposed a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. Application note 4(a) of section 3C1.1 provides that a defendant's "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so" warrants an enhancement for obstruction of justice. U.S.S.G. § 3C1.1, comment. (n.4(a)). "[A]n attempt to intimidate or threaten a witness, even if unsuccessful, is sufficient to sustain a two-level enhancement for obstruction of justice." United States v. Moss, 138 F.3d 742, 746 (8th Cir. 1998).

The presentence investigation report and the evidence adduced at trial reveal that Thompson directed acts of intimidation toward two prosecution witnesses, Michael Toner and Fred Rice. Prior to trial, Thompson telephoned Toner and demanded that Toner swear on the lives of his children that he had not cooperated with authorities. Thompson also warned Toner that he could expect a visit from Thompson once he was released from jail. At trial, Thompson directed similar threats to Rice, calling Rice derogatory names and making a throat-cutting gesture while Rice was testifying. The district court interpreted these acts as attempts to impermissibly influence or intimidate under section 3C1.1, and we cannot say that such a finding was clearly erroneous. See

Moss, 138 F.3d at 745-46 (defendant's "cutthroat" gesture to witness during trial was obstruction of justice); United States v. Nunn, 940 F.2d 1128, 1133 (8th Cir. 1991) (telephone threat made to a potential witness constituted obstruction of justice).

### C. Possession of a Firearm

Finally, Thompson argues that the district court erroneously imposed a two-level increase to his base offense level pursuant to U.S.S.G. § 2D1.1(b)(1), which provides for such an increase where a defendant possessed a firearm in connection with a drug offense. For this provision to apply, the government must "prove by a preponderance of the evidence that a weapon was present and that it was at least probable that the weapon had a nexus with the criminal activity." United States v. Newton, 184 F.3d 955, 957 (8th Cir. 1999). A nexus exists where there is a "temporal and spatial relation between the weapon, the drug trafficking activity, and the defendant." Id. at 958.

The record is replete with evidence that weapons played a role in Thompson's drug activity, including testimony that on two occasions Thompson possessed a firearm while he was actively engaged in drug transactions. In 1994, during the negotiation of a drug sale with Pisterzi, Thompson told the FBI agent that he was carrying a handgun and then patted his left hip to indicate its location. Two years later, Thompson fired a shotgun into the air while transferring drugs to one of his distributors. In light of this evidence, the district court did not clearly err in finding a sufficient nexus between Thompson's drug activity and firearms so as to make section 2D1.1(b)(1) applicable.

The judgment and sentence are affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.