# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2305

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Ekueta Palega, | * | |
| also known as "Q" Palega, | * | |
| | * | |
| Defendant - Appellant. | * | |
| | * | |

_____

Submitted: December 11, 2008
Filed: February 18, 2009

_____

Before COLLOTON and SHEPHERD, Circuit Judges, and GOLDBERG, Judge.[1]

_____

GOLDBERG, Judge.

In 2007, Ekueta Palega was convicted of conspiracy and possession of methamphetamine with intent to distribute. Prior to his arrest, on December 1, 2006, law enforcement officers attempted to execute a search warrant issued by Magistrate

_____

[1]The Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

Judge Mark A. Moreno[2] two days prior. The warrant authorized the search of the residence of Morris Palega a/k/a "Q" and Eddie Castro a/k/a "Eddie Burnette," as well as their persons, including urine samples. The location of the residence in the warrant was given through a physical description; no specific address was provided. When law enforcement officers arrived at the residence described, Ekueta Palega, the Defendant, was present. At that time, they discovered that Morris Palega and "Q" were not the same person. "Q" was a nickname for Ekueta Palega, the Defendant, and Morris Palega, the proper name listed on the warrant, is his brother. The residence described in the warrant belonged to Ekueta Palega, and not Morris Palega. After discussion with Magistrate Judge Moreno, the officers proceeded to search Ekueta Palega's residence and obtained a urine sample from him. Seven days later, a second warrant was requested and granted for a backpack and three locked safes, which were discovered during the December 1 search.

Prior to trial, Palega moved to suppress his statements and the evidence seized from his residence on December 1 and December 8, 2006 on Fourth and Fifth Amendment grounds. The motion was denied and the statements and evidence were presented to the jury. Palega now appeals the admission of the statements and evidence, as well as the sentence he received. Because Palega is, in fact, Q and because the correct residence was searched, we affirm the district court's[3] decision to uphold the search warrant, and the decision to admit the urine sample. We also affirm the drug quantity used by the district court to determine Palega's sentence. However, because the forfeiture amount was incorrectly stated in the order, the Court remands for correction of this error.

---

[2]The Honorable Mark A. Moreno, United States Magistrate Judge for the District of South Dakota.

[3]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

## I. The Validity of the Warrant

A. <u>Description of the Residence in the Warrant</u>

Palega argues that since the authorities failed to stop the search and seek a new warrant after discovering the discrepancy in the names listed in the warrant, the district court should have suppressed all evidence seized during the search, all statements made by Ekueta Palega, and all evidence found in later searches as fruits of the poisonous tree.[4] However, it is sufficient that the description of the premises in the warrant is such that the officer can, with reasonable effort, ascertain and identify the place intended, and avoid mistakenly searching the wrong premises. *United States v. Gamboa*, 439 F.3d 796, 806 (8th Cir. 2006). Importantly, warrants have been upheld "where one part of the description of the premises to be searched is inaccurate, but the description has other parts which identify the place to be searched with particularity." *United States v. Gitcho*, 601 F.2d 369, 371 (8th Cir. 1979).

Here, the description of the residence in the warrant provided enough accuracy to locate the intended structure, regardless of the owner's name specified. Individual statements given in the warrant affidavit described, both physically and with sufficient directions, the residence in question. In addition, two agents had previously conducted surveillance on this particular house. Photographs of the residence searched were taken both pre-surveillance and at the time the search warrant was executed. This case is unlike *Maryland v. Garrison*, 480 U.S. 79 (1987), where the search of an apartment was properly ceased after it was discovered that it was the incorrect apartment. Here, the correct residence was searched and there was no need to amend the warrant prior to executing the search.

---

[4]At issue is the warrant for Palega's residence, since the warrant for his person was not executed.

The incorrect first name listed in the warrant is a negligible error. The full name listed on the warrant was "Morris Palega, also known as Q." However, Ekueta Palega, not Morris Palega, is the individual known as Q. On December 1, while the warrant was being executed, an officer that had previously been called to the residence identified Defendant as the man he thought was Morris Palega. There was simply confusion regarding Defendant's first name. Q is the individual whose residence the law enforcement officers sought to search, and Defendant is Q. Innocent mistakes or negligence alone are insufficient to void a warrant. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Palega does not allege that the error in the first name was more than negligence or an innocent mistake. Despite the incorrect first name, the residence itself was adequately identified and described in the warrant affidavit; thus, the probability of a mistaken search was negated. Quite simply, the residence that the officers intended to be searched was searched.

B. <u>Probable Cause</u>

Palega also contends that there was insufficient probable cause for the warrant because the warrant affidavit did not provide sufficient information to determine the reliability or credibility of the informants, and because the information provided was otherwise stale. Probable cause exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 214 (1983). This requires consideration of the totality of the circumstances and considerable deference is given to the district court's determination of probable cause. *Gamboa*, 439 F.3d at 805. In analyzing the totality of the circumstances, an informant's veracity, reliability, and basis of knowledge are all relevant and important factors. *Gates*, 462 U.S. at 230. "The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable." *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993). A "disclosure in the affidavit that the informant was an admitted participant in the crime and therefore an eyewitness to most of the acts constituting the crime as described in the affidavit" is

one manner to determine the credibility and reliability of an informant. *United States v. Long*, 449 F.2d 288, 293 (8th Cir. 1971).

Here, the warrant affidavit includes statements from at least one informant who indicated that he had bought methamphetamine directly from Q, which implicates the informant in the crime. There were additional statements from other informants indicating that they were aware that Q sold drugs, or that Q was the provider to their drug dealer. Several of the sources described the residence of Q as the residence that was then listed in the warrant and also described Q physically. In only one instance did an informant, as described in the affidavit, refer to the drug dealer as "Morris Palega" and not as "Q"; however he provided a physical description that is similar to that of the Defendant. Because these informants admitted to participating in drug crimes themselves, their credibility stems from this participation and the first-hand accounts of their interactions with or knowledge of the Defendant. Additionally, Officer Baldwin's surveillance of Q's residence on two separate occasions revealed an unusual frequency of short term visitors late at night. The statements of the informants and the surveillance, when taken collectively, indicated that there was a fair probability that the residence described would contain contraband. The totality of the circumstances thus provided probable cause for the search warrant.

Palega's argument that the information in the warrant affidavit is stale and outdated is similarly misplaced. Regarding the information presented to the magistrate judge, it is material that "the facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past." *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993). While some of the information provided in the warrant affidavit was more than two years old, there was also information as recent as five days prior to the warrant application. In short, the affidavit describes a

continuing pattern of behavior, and when taken as a whole, the information is not stale.

## II.    Palega's Consent to the Urine Sample

Palega separately seeks to suppress his urine sample as well as statements made to Officer Baldwin alleging that they were obtained in violation of his *Miranda* rights under the Fifth Amendment. When his *Miranda* rights were first read to him at 9:09 a.m. on the morning of the search, Palega stated that he did not want to speak and requested an attorney. There are two versions as to what occurred next. Officer Baldwin testified that Palega was then handcuffed and remained in the kitchen. According to Agent Estes's and Officer Baldwin's testimony, after 30 minutes had elapsed, Palega requested to speak to Baldwin. Palega indicated that he understood his *Miranda* rights and he had now decided to waive them. Palega signed the waiver at 9:51 a.m. According to Baldwin's version of the events, he questioned Palega for approximately an hour. Palega then indicated that he needed to urinate. Baldwin asked if he would consent to give a urine sample and Palega verbally consented. After the sample was collected and after discussing the issue with the magistrate judge, Baldwin also obtained written consent from Palega. At that time, Baldwin had told Palega that he would throw away the sample if Palega chose not to give his written consent. Palega rejected the offer and gave his written consent.

FBI Agent Mackey testified to a different version of events. He stated that he spoke with Magistrate Judge Moreno on the phone to discuss the issue with the warrant at approximately 9:35 a.m. At that time, the magistrate judge indicated that the officers should obtain written consent from Palega for the urine sample. Palega argues that this discrepancy in testimony indicates that the urine sample was obtained prior to the waiver of his *Miranda* rights at 9:51 a.m., and after he had invoked his right to remain silent and his right to counsel at 9:10 a.m.

The Supreme Court has held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). Authorities cannot further interrogate the accused without counsel, unless the accused initiates further communication with the police. *Id.* at 484-85. Here, Palega independently reinitiated communication with Baldwin after first invoking his *Miranda* rights. He also stated he understood his rights and wished to waive them. His consent for the urine sample was obtained lawfully, and his statements were not obtained in violation of *Miranda*.

With respect to the discrepancy in the time line of events, the magistrate and the district court impliedly adopted Officer Baldwin's version of the events in denying the motion to suppress. As a factual finding, this is reviewed for clear error. *United States v. Pruett*, 501 F.3d 976, 979 (8th Cir. 2007). Both Agent Estes and Officer Baldwin corroborated the same version of the events. Palega never affirmatively disputed Baldwin's or Estes's testimony at the district court level. Accordingly, there is no clear error in the findings made by the district court.

## III. Sentencing Issues

A. <u>Drug Amount</u>

Palega disputes the use of informant Phillip Burnette's testimony for sentencing purposes stating that he had witnessed Palega with a "big bag" of methamphetamine, which was "about 8 inches high and 14 inches around" weighing "approximately two pounds" (907.2 grams). When questioned as to the basis of his weight estimation, he stated, "I really don't know, sir. I never weighed that much in my life. I seen it." Burnette testified that he had previously weighed up to approximately 7 grams of

methamphetamine. On cross-examination, he also testified that he was simply speculating as to the weight of the bag. The court found that Palega was accountable for at least 1.5 kilograms of methamphetamine, based on evidence of 1152.74 grams that Palega does not dispute on appeal, plus the amount to which Burnette testified.

This Court reviews a sentencing court's finding of fact regarding the quantity of drugs for clear error. *United States v. Atkins*, 250 F.3d 1203, 1211 (8th Cir. 2001). This Court shall only disturb the sentencing court's determination should the entire record "definitively and firmly convince[] us that a mistake has been made." *United States v. Titlbach*, 300 F.3d 919, 923 (8th Cir. 2002). In determining the drug quantity, the district court may consider any relevant information "provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S. Sentencing Guidelines Manual § 6A1.3(a) (2007); *see United States v. Vinton*, 429 F.3d 811, 817 (8th Cir. 2005). Where the amount of drugs seized does not reflect the scale of the offense, "the court shall approximate the quantity of the controlled substance." U.S. Sentencing Guidelines Manual § 2D1.1, cmt. n. 12 (2007).

The district court included Burnette's two pound estimate in calculating the base offense level for sentencing. Although Burnette was speculating as to the exact weight of the bag, it was not unreasonable for the district court to conclude Burnette's calculation to be reliable given the size of the bag in question. The court's determination is sufficiently supported by the testimony given. Thus, the district court did not clearly err by incorporating this amount into the final base offense level calculation.

B. Forfeiture Amount

Regarding the forfeiture amount, both parties agree that the correct amount should be $3,338.00. When the district court imposed the sentence, it incorrectly

stated the forfeiture amount as $3,628.80, which was an erroneous amount listed in one of the indictments.  This error should also be corrected on remand.

For the foregoing reasons, the Court affirms Defendant's conviction, but remands the case to the district court for correction of the forfeiture amount.

_____