# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-1241

_____

United States of America,

*Plaintiff - Appellee,*

v.

Brandy Lemons,

*Defendant - Appellant.*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: December 12, 2014
Filed: July 7, 2015

_____

Before WOLLMAN, COLLOTON, and BENTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Brandy Lemons was convicted of making a false statement to the government and theft of government funds in connection with receipt of social security disability benefits. The district court[1] sentenced her to a term of 12 months and a day in prison.

_____

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

Lemons challenges several evidentiary rulings at trial and asserts a procedural error at sentencing. We affirm.

I.

Lemons applied for social security disability benefits in June 2009 after she was diagnosed with arachnoiditis, a pain disorder caused by inflammation of a membrane that surrounds the nerves of the spinal cord. In her application, Lemons asserted that pain and fatigue required her to limit her activities, and that all physical activity caused her additional pain in her neck, back, and legs.

The state agency that processes disability claims for the Social Security Administration denied her application, but she appealed successfully to an administrative law judge. The ALJ awarded benefits, effective in March 2008. In May 2010, Lemons began to receive $802 per month. The ALJ, having been advised that Lemons's condition was expected to improve with treatment, recommended a follow-up review in May 2011. But the Administration failed to conduct the review and never contacted Lemons.

In June 2011, the Administration received an anonymous letter disclosing that Lemons was capable of engaging in physical activities that were inconsistent with her claim of a back injury. The mailing included photographs of Lemons using a chainsaw to cut tree limbs while in the tree and then cutting those limbs into smaller pieces on the ground. The pictures also captured Lemons pulling her three-year-old son up a hill in a wagon. At trial, another son, John David Jackson, testified that he took these photographs in June 2011.

The Administration started an investigation. Investigators conducting surveillance at Lemons's residence in September 2011 saw her take out the trash, pick up her young son, and push her son in a shopping cart for extended periods of time.

-2-

They followed Lemons to a concert venue and saw her standing and walking for over an hour without assistance or appearance of pain. They also discovered posts on Lemons's Facebook page suggesting that Lemons hunted game with a bow, attended hunter safety classes, and rode an all-terrain vehicle for two hours.

In October 2011, the Administration initiated the follow-up review that had been recommended by the ALJ; the review covered May 28, 2010, through October 11, 2011. Lemons responded that she had no hobbies or interests, could not pick up anything over 20 pounds without causing increased pain, and could not sit more than thirty minutes without experiencing additional pain. She wrote that any physical activity caused increased pain, and that her condition affected her ability to lift, bend, stand, walk, and concentrate. She said that her condition took away her ability to enjoy life.

In January 2012, the Administration discontinued benefits due to medical improvement. Lemons filed an administrative appeal. She chose to continue receiving benefits during the appeal process, with the understanding that she would repay the government if she did not prevail. In connection with the appeal, investigators met with Lemons's treating physician, Dr. Patricia Hurford, and showed her surveillance video of Lemons engaging in physical activities. After seeing the video, Dr. Hurford revised her previous assessment that Lemons was disabled and concluded that Lemons could perform some type of work.

In April 2012, hearing officer Bonnie Young upheld the cessation of Lemons's benefits. Young's decision also recorded a finding of "Fraud or Similar Fault" in the case. The decision found that Lemons's allegations about her physical limitations were not substantiated.

Lemons appealed again to an administrative law judge. ALJ James Steitz determined in January 2013 that Lemons's disability ended as of January 1, 2012, and

he upheld hearing officer Young's decision. ALJ Steitz found "wholly incredible" Lemons's allegations about the severity of her symptoms and limitations. The decision concluded that Lemons was "obviously very active" and explained that she "engages in enjoyable activities such as attending a concert, bow hunting, and riding a four wheeler," as well as "shopping, lifting shopping bags, and lifting her son."

A grand jury eventually charged Lemons with two counts of making a false statement, in violation of 18 U.S.C. § 1001, and three counts of theft of government funds, in violation of 18 U.S.C. § 641. The case proceeded to trial, and a jury found Lemons guilty on the three counts of theft and one count of making a false statement. The false-statement count of conviction alleged that Lemons represented to the Administration that she had no hobbies or interests, could not pick up anything over 20 pounds without causing increased pain, and that sitting more than 30 minutes caused additional pain, when in fact Lemons attended hunter safety classes, bent and lifted objects and people, hunted deer during bow season, regularly practiced bow hunting with a 30-pound compound bow, attended a concert, and rode an all-terrain vehicle for two hours.

At sentencing, the district court calculated an advisory guideline range of 27-33 months' imprisonment, based on an amount of intended loss totaling $284,018.64. *See* USSG § 2B1.1(b)(1)(G). The court then varied downward in light of 18 U.S.C. § 3553(a) and sentenced Lemons to 12 months and one day in prison. Lemons appeals the convictions and sentence.

## II.

Lemons first challenges the district court's decision to publish to the jury an exhibit with material gathered from her Facebook page on the Internet in 2011. The screen shots showed statements by the account holder, Lemons, and statements by third parties who were not witnesses at trial. Lemons argues that the district court's

-4-

refusal to order redaction of the statements by third parties was error, because the statements were irrelevant, *see* Fed. R. Evid. 402, or because any probative value of the statements was substantially outweighed by their prejudicial effect. *See* Fed. R. Evid. 403.

During the trial, as the government prepared to offer the Facebook material in evidence, Lemons acknowledged that her own statements were admissible, but she objected to the statements of others because they were hearsay and she had "no control as to what people put on there." The prosecutor responded that "[w]e're willing to redact anything that [defense counsel] believes is prejudicial to his client," but then expressed concern that "there are some conversations that put in context what [Lemons's] answer is." The court made no ruling, and the Facebook material (Exhibit 5A) was admitted in evidence. The prosecution's theory was that Lemons made admissions that showed the falsity of her statement to the Administration that she had "no hobbies or interests."

A witness for the prosecution, referring to the exhibit, then recounted several statements that Lemons made on Facebook, including:

- "How come shootin makes you feel so good?"

- "I can shoot my bow all I want to here at the house, but I am soooo ready to move so I can walk out my back door and let the lead fly!"

- "Goin to look at 95 acres in the morning. . . . If the land ain't right for us at least I get to spend some time with my wonderful husband and enjoy Gods great creation from the back of a 4 wheeler."

- "The land wasn't exactly what we [are] looking for. . . . But we spent 2 hours ridin and lookin and I only had to tell him which way to go a dozen times!"

- "The boys have gone fishing while I'm stuck here in this dang hunter safety class."

- "Since I did so well on my test, I get to accessorize my new bow. . . . So now we r shopping at Cabela's."

- "2 weeks till Bow Season starts and 3 weeks till TB/EC concert . . . it's lookin like a good [month]."

- "The count down has begun. . . .1 month till the TOBY KEITH/ERIC CHURCH concert . . . got Box seats . . . it's gonna be AWESOME!"

- "Tucker has his 1st bow class tonight . . . momma might fling a few too."

- "President/CEO at Full Time Stay At Home Momma . . . Studied at Graduate of the School of Hard Knocks . . . Married to Jared Lemons."

- "Full Time Stay At Home Momma with Jared Lemons. President/CEO[,] March 2008 to present. Blessed to be able to raise my baby cause my husband and bes friend is able to make that happen."

The witness did not report statements made by third parties on the Facebook account. Lemons asserts that third-party statements were covered by white paper when the exhibit was displayed to the jury during trial, and the government does not disagree.

After the evidence closed and the jury retired to deliberate, the jury sent a note requesting a copy of the indictment and an index of the evidence. In response, the court decided to deliver the indictment and the exhibits. Lemons objected to sending the Facebook postings unless the exhibit was redacted to obscure comments made by

third parties.  Lemons argued that the comments were hearsay, and, in the alternative, that the probative value of one particular comment was substantially outweighed by the danger of unfair prejudice.  The comment was made after Lemons wrote that "[t]he boys have gone fishing while I'm stuck here in this dang hunter safety class." A person identifying himself as Eric Bradley wrote, "Shouldn't you be teaching that class?"

The government opposed redaction and asserted that "[t]here's been no allegation that these posts are fraudulent or fictitious."  As to the comment highlighted by Lemons, the government argued that "[i]t flows with the conversation," and "it fits with the Government saying that she has interests, and . . . here's someone . . . responding to her about the hunter safety class and her being in it." The court overruled Lemons's objection without elaboration, and the exhibit was delivered to the jury.

Lemons argues on appeal that the Facebook posts by third parties were irrelevant to whether she made false statements as charged, and that the evidence caused unfair prejudice.  She complains that the government agreed to redact anything that she believed was prejudicial when the exhibits were received in evidence, but then refused to redact comments from third parties when the court addressed the matter after the close of the evidence.  Lemons objects that she was unable to cross-examine any of the government's witnesses about the comments, because she relied on the government's representation that it would go along with redacting prejudicial material.  We review the district court's evidentiary rulings for abuse of discretion.  *United States v. Condon*, 720 F.3d 748, 754 (8th Cir. 2013).

Where a defendant's admissions are part of a conversation with a third party who is not a witness, the court has discretion to admit the non-witness's statements when they make the defendant's responses "intelligible to the jury and recognizable as admissions."  *United States v. Stelten*, 867 F.2d 453, 454 (8th Cir. 1988) (per

curiam). In that situation, the third-party statements are not offered for the truth of the matter asserted by the non-witness, so they are not hearsay. *Id.* Some of the Facebook posts at issue here are in the nature of a conversation between Lemons and third parties, and the district court reasonably could have believed that review of the complete exhibit would enlighten the jury about the meaning of admissions by Lemons. The disputed posting by Bradley, for example, asking whether Lemons shouldn't be teaching the hunter safety class, was followed by another comment by Lemons that could be viewed as a reply: "Since I did so well on my test I get to accessorize my new bow. . . . So now we r shopping at Cabela's." Given the wide discretion accorded the district court on evidentiary matters, we cannot say it was an abuse of discretion to admit the Facebook comments of third parties for context only. The comments were relevant for that limited purpose, and if considered only for that limited purpose, the probative value was not substantially outweighed by a danger of unfair prejudice.

Unfortunately, however, the court did not specify that the receipt of third-party statements on the exhibit was for a limited purpose. The district court gave no limiting instruction to the jury when the exhibit was received. By the time the court made its decision about delivering exhibits to the jury room during deliberations, it was too late as a practical matter for Lemons to request a limiting instruction about the exhibit. *Cf. United States v. Gayekpar*, 678 F.3d 629, 637-38 (8th Cir. 2012). Nothing prevented the jury from considering the comments of non-witnesses on Facebook for the truth of the matters asserted in those comments.

The matter is complicated further by the positions of the parties on appeal. Lemons does not renew on appeal her contention that the Facebook comments of non-witnesses were inadmissible hearsay. She argues only that the comments were irrelevant and unfairly prejudicial. At most, therefore, we consider the hearsay issue under the plain error standard of Rule 52(b). *See Silber v. United States*, 370 U.S. 717, 717-18 (1962). The government does not argue that receipt of the exhibit was

harmless error, but since the hearsay error was not raised by Lemons, there was no need for the government to address whether that error was harmless.

In the end, we conclude that the court's delivery of the Facebook exhibit to the jury room did not affect Lemons's substantial rights. The comment to which Lemons objects—"Shouldn't you be teaching that class?"—may have implied that the commentator thought Lemons was experienced in hunter safety. But the comment was cumulative of other substantial evidence that tended to show that hunting and shooting was a hobby or interest for Lemons at a time when she denied having any hobbies or interests.

Lemons's Facebook posts said that shooting made her feel good, that she could shoot her bow as much as she wanted at her house, and that she looked forward to the opening of bow season. She remarked that she wanted to move to a new location so that she could shoot a firearm on her property. The owner of an archery pro shop testified that Lemons purchased a bow from him in August 2011 and then started to visit the facility once or twice a week for target shooting. On August 13, Lemons followed the comment about teaching the class by remarking that she was shopping to accessorize her new bow. This evidence gave the jury a substantial basis to find that Lemons made a false statement in October 2011 when she denied having any hobbies or interests. In view of the record as a whole, the mistaken admission of hearsay in Exhibit 5A does not warrant reversal of the conviction.

III.

Lemons next challenges the district court's decision to admit the testimony of ALJ Steitz and Hearing Officer Young about their conclusions during administrative proceedings. She contends that their testimony about whether Lemons was disabled for purposes of receiving benefits confused the jury about the issues in the criminal case and invaded the province of the jury by directing the jury what to find.

Steitz and Young testified as lay witnesses, not as experts. Each was permitted by the rules of evidence to express an opinion that was rationally based on his or her perception, and helpful to understanding the witness's testimony or to determining a fact in issue. Fed. R. Evid. 701; *United States v. Johnson*, 688 F.3d 494, 503 (8th Cir. 2012).

The testimony of Steitz and Young satisfied these criteria. Steitz based his testimony on observations of Lemons during her hearing and his experience observing other disability claimants. Young relied on her observations of Lemons during their interview and her 32 years of experience in working with individuals with disabilities. The testimony was helpful to determining a fact in issue—namely, whether Lemons made a material false statement to the Administration. A statement is material if it is capable of influencing a decision of the agency. 18 U.S.C. § 1001; R. Doc. 52, at 19. That Steitz or Young found it significant in the administrative decisionmaking process that Lemons could perform more functions than she claimed in her statements to the Administration tended to show that her false statements were material. The testimony of the witnesses was therefore relevant and admissible as lay opinion testimony.

Lemons complains that ALJ Steitz improperly testified about Lemons's credibility. Steitz did say that evidence about the functions that Lemons was capable of performing "goes to her credibility," and that "credibility" is a key factor in his decisionmaking process. Although the jury might well have inferred that Steitz thought Lemons was incredible when he rejected her claim for benefits, that inference was already available merely from the fact that Lemons was denied benefits despite her statements that she was incapable of working. Steitz did not testify directly about a finding on Lemons's credibility, and the jury was instructed that it was the sole arbiter of the facts, unconstrained by the conclusions of any witness. The admission of Steitz's testimony did not affect Lemons's substantial rights.

-10-

Lemons also says she was prejudiced by the district court's receipt into evidence of a signed statement of Dr. Hurford, in which the doctor wrote that Lemons could perform some type of work. Hurford's letter and accompanying testimony were relevant to whether her allegedly false statements were material. Based on Lemons's statements, Hurford first concluded that Lemons could not work. When Hurford saw the videotape of Lemons performing physical activity, she revised her assessment. Whether Lemons was eligible for disability benefits turned largely on whether she was able to work. Hurford's letter therefore assisted the jury in understanding the importance of Lemons's false statements to her receipt of government benefits.

IV.

Lemons next argues that the district court erred in refusing to take judicial notice of the Administration's regulations regarding overpayment. In one count, the government charged her with stealing government funds during a period when her administrative appeal on cessation of disability benefits was pending. Lemons chose to continue receiving disability benefits during the appeal process, but acknowledged that if she lost the appeal, then she would be asked to pay the money back. Lemons contends that the overpayment procedure is relevant to show that she had no intent to steal. Lemons also argues that the regulations are relevant to establish that she was not on notice that it was a crime to receive the funds. We review the district court's decision for abuse of discretion. *United States v. Hale*, 978 F.2d 1016, 1021 (8th Cir. 1992).

The district court questioned whether the overpayment regulations were relevant to whether Lemons stole funds from the government, and declined to take judicial notice. The ruling was not an abuse of discretion. The regulatory procedure by which the government manages overpayments either was not relevant, or any minimal probative value was substantially outweighed by a danger of confusing the issues and needlessly presenting cumulative evidence. *See* Fed. R. Evid. 403. The

record already showed that Lemons chose to receive benefits during the administrative appeal and acknowledged that she would be asked to pay the money back if the appeal was unsuccessful. There was no dispute that this procedure was allowed by regulation, and Lemons was free to argue that her acknowledgment showed an absence of intent to steal. Lemons was on notice from the criminal code that it was unlawful to steal funds from the government. Whether the social security regulations gave such notice was not relevant.

V.

Having concluded that the conviction should be affirmed, we address Lemons's challenge to her sentence. She argues that the district court committed procedural error in computing her advisory guideline range. The district court found that the amount of loss to the government was the amount that Lemons *intended* to collect through the age limit of 62—the age at which Lemons would qualify for retirement—if her fraud was not discovered. The court found that this amount was $284,018.64. Lemons counters that the court should have used the *actual* loss incurred—a considerably lesser amount of $18,111.90. We review the district court's interpretation of the guidelines *de novo* and its calculation of loss for clear error. *United States v. Killen*, 761 F.3d 945, 948 (8th Cir. 2014).

Lemons's offense level under the sentencing guidelines depends on the amount of loss. USSG § 2B1.1(b). Subject to exclusions not relevant here, "loss is the greater of actual loss or intended loss." *Id*., comment. (n.3(A)). The court was therefore correct to use the amount of intended loss to calculate the offense level. *See United States v. Frisch*, 704 F.3d 541, 544 (8th Cir. 2013); *Killen*, 761 F.3d at 949.

"[I]ntended loss" under the guidelines is "the pecuniary harm that was intended to result from the offense." USSG § 2B1.1(b), comment. (n.3(A)). "When calculating intended loss, the appropriate inquiry is what the loss would have been

-12-

if the defendant had not been caught." *Frisch*, 704 F.3d at 544. The district court found that Lemons intended to collect disability benefits through age 62 and calculated the loss on that basis.

The court's finding was not clearly erroneous. We have recognized that "a district court may reasonably conclude that the defendant intended continued receipt of illegal benefits until retirement without additional *mens rea* evidence." *Killen*, 761 F.3d at 950. In this case, there was additional evidence. Lemons sought to convince the Administration that her disability was permanent and to discourage further review. She wrote in a function report dated November 7, 2011, that arachnoiditis "is not a condition that will improve over time," and said, "I hope that another Review is not necessary because holding my head down filling out this form is causing increased pain in my neck and back." She also appealed the cessation of her benefits three times, thus indicating a determination to continue the receipt of public funds. There was sufficient evidence to find that Lemons intended to collect disability benefits until she reached the age limit of 62.[2]

\* \* \*

The judgment of the district court is affirmed.

_____

_____

[2]Lemons also disputes the district court's finding that her receipt of a discharge of a student loan in Tennessee based on her claim of disability increased the amount of loss. The amount at issue, $9,116.64, does not affect the offense level under the guidelines, *see* USSG § 2B1.1(b)(1)(G), so it is unnecessary to address the point.