# United States Court of Appeals
### For the Eighth Circuit

_____

No. 15-1374

_____

United States of America

*Plaintiff - Appellee*

v.

Demetrius Colbert, also known as D-Coop

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: January 14, 2016
Filed: July 8, 2016

_____

Before WOLLMAN, MELLOY, and COLLOTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Demetrius Colbert appeals from his conviction on several drug-trafficking and firearm-related charges and from the sentence imposed by the district court.[1]  We affirm.[2]

I.

Colbert's conviction was one of many resulting from Operation Delta Blues, a multi-year, multi-agency drug-trafficking and public-corruption investigation conducted by the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration, the Internal Revenue Service, the Bureau of Alcohol Tobacco and Firearms, and the criminal-investigation division of the Arkansas State Police.  The investigation resulted in more than seventy arrests, which included those of officers in the Helena-West Helena Police Departments and the Phillips County Sheriff's Office.

In early 2011, court-ordered wiretaps on phones used by Sedrick Trice and Leon Edwards, along with information provided by a confidential witness revealed that Colbert was a large-scale cocaine distributer in Marianna and Helena-West Helena, Arkansas.  Based on that information, on April 12, 2011, the FBI obtained a court order granting a wiretap for a thirty-day period on a cell phone that the FBI believed was primarily used by Colbert.  The FBI obtained court authorization for a thirty-day extension of the wiretap beginning on May 12, 2011.  The wiretap ended on June 10th or 11th, by which time the FBI had intercepted more than 7,000 calls made or received by Colbert's cell phone, approximately 710 of which the FBI determined were related to criminal activity.

---

[1]The Honorable James M. Moody, Jr., United States District Judge for the Eastern District of Arkansas.

[2]We grant Colbert's motion for permission to file a *pro se* supplemental brief.

A grand jury returned a seventeen-count indictment charging Colbert and seven others on October 4, 2011. An arrest warrant was issued for Colbert the following day. The government obtained a search warrant on October 6, 2011, for Colbert's home located on Hillcrest Street in Marianna, Arkansas (the Hillcrest Street house). The search warrant permitted law enforcement officers to search the residence for evidence of money laundering and to execute the search warrant at any time of the day or night.

The FBI's Special Weapons and Tactics (SWAT) team executed the warrant at 4:00 a.m. on October 11, 2011. Colbert was in the house at the time, along with his long-time girlfriend Catina Davis and their two children. The twelve-member SWAT team arrived at the Hillcrest Street house in two SUVs and was accompanied by a state trooper. Upon arriving at the house, the state trooper illuminated his squad car's blue overhead lights, which he directed at the front of the house in order to alert anyone inside to the FBI's presence. Two SWAT-team members acted as "breachers," who were responsible for positioning themselves outside the front door on the left- and right-hand sides, announcing the FBI's presence, and, if necessary, forcing the door open with a hand-held battering ram. After the team was positioned, FBI Agent Wendell Cosenza, the breacher positioned to the right of the door, knocked loudly on the front door with his extendable baton and announced, "FBI, warrant, come to the door." He repeated the knock-and-announce sequence two more times, pausing briefly each time, with the entire process taking less than one minute. The team leader then instructed the other breacher to "hit it" and breach the front door with the battering ram.

Immediately before the battering ram struck the front door, a shot was fired from within the house, followed by at least seven more shots in rapid succession after the door was breached. After the front door was forced open, an agent threw a flashbang grenade into the house, the team leader issued a "cover up" command, and the team retreated to covered positions. During the shooting, two FBI agents returned

fire into the house. One agent fired three shots through the front window of the house into the living room, toward where the first shots originated, and moments later another agent fired two shots through a bedroom window, located to the left of the front door, after the agent observed a gun in the window. One of the bullets fired from inside the house struck Agent Cosenza in the leg. After the FBI agents took cover, they ordered those in the house to surrender. Approximately one or two minutes later, Davis surrendered to the FBI's custody, followed by Colbert approximately one or two minutes after Davis's surrender. Team members then secured the house and brought Colbert's children out of the house.

During the subsequent search of the house, FBI agents recovered $423,313 in cash hidden throughout the house (including $139,673 found in two bags that were located in the trunk of Colbert's 1971 Oldsmobile Cutlass), a .40 caliber handgun with an empty magazine from the top of the vanity in the master bathroom, empty plastic bags containing cocaine residue from the toilet in the master bathroom, digital scales containing cocaine residue from the master bathroom and the garage, several pieces of diamond jewelry worth approximately $26,000, and two of Colbert's five cars.

In a superseding indictment, a grand jury charged Colbert with one count of conspiracy to distribute or possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), and two counts of use of a communications facility in furtherance of a drug-trafficking crime, in violation of 21 U.S.C. § 843(b) (collectively the conspiracy charges). It further charged Colbert with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), with assaulting a federal officer with a dangerous or deadly weapon, in violation of 18 U.S.C. § 111(b), and with possession and discharge of a firearm in connection with a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (collectively the firearm-related charges).

Colbert filed pretrial motions to suppress evidence from the wiretaps and the search and to sever the trial. Colbert objected to the wiretap evidence on the ground that the government had not met its burden under 18 U.S.C. § 2518(1)(c) to show that a wiretap was necessary. Colbert objected to the search warrant on the ground that the affidavit did not establish a nexus between the Hillcrest Street house and money-laundering evidence. In support of his motion to sever, Colbert argued that the firearm-related offenses were unrelated to the drug-trafficking-related offenses.

The government filed a pretrial motion to suppress testimony from Marcus Thompson, one of Colbert's co-conspirators. Thompson was arrested on the same day as Colbert by an FBI hostage rescue team (HRT) executing a no-knock warrant. When the HRT ignited an explosive breaching device attached to Thompson's front door, Thompson fired several rounds. Thompson would have testified that he believed someone was breaking into his home to steal his drugs and money. Colbert argued that this testimony would demonstrate that he reasonably believed that he was acting in self defense when he fired his gun at the SWAT team. The government objected to the testimony, arguing that it was irrelevant because of the different tactics used by the two teams.

The district court denied Colbert's motions and granted the government's. The case proceeded to a five-day jury trial. Before the case was submitted to the jury, Colbert moved for a judgment of acquittal on each of the counts except the felon-in-possession count, on which he conceded his guilt. As relevant here, Colbert argued that he was entitled to a judgment of acquittal on the counts of assaulting a federal officer, and of brandishing and discharging a firearm in furtherance of a federal drug-trafficking offense, because he had acted in self defense. The court denied Colbert's motion, Colbert presented no evidence, and the jury found him guilty of all of the charged offenses.

Colbert's presentence investigation report (PSR) calculated the drug quantity that Colbert was responsible for to be 200 kilograms of cocaine and 21 kilograms of crack cocaine. That drug quantity was based on testimony from Alvin Long, Marcus Thompson, and Leon Edwards, as well as on the intercepted telephone conversations that were played at trial. Based on that drug quantity, the PSR calculated Colbert's base offense level to be 38 for the conspiracy, communications-facility, and felon-in-possession offenses. The PSR applied a 2-level enhancement based on Colbert's pattern of criminal conduct, which was Colbert's sole source of income, and a 4-level enhancement based on Colbert's leadership role in the organization, resulting in an adjusted offense level of 44. The PSR calculated Colbert's offense level to be 27 for his assault offense, but that conviction did not affect his total offense level due to the multiple-count adjustment. Because Colbert's combined offense level was greater than the highest level permitted by the U.S. Sentencing Guidelines (U.S.S.G. or Guidelines), the resulting total offense level was 43. Based on an offense level of 43 and a criminal history category of III, the Guidelines' advisory sentence was life imprisonment. For the offense of brandishing or discharging a firearm in furtherance of a drug-trafficking crime, the Guidelines recommended the mandatory minimum sentence of ten years' imprisonment, to be served consecutively to the sentence for the other offenses. The resulting advisory Guidelines sentence was life imprisonment, with a 10-year consecutive sentence to follow.

Colbert objected to the PSR's drug-quantity calculation and to the application of several enhancements, including the 4-level leadership-role enhancement. The district court rejected Colbert's objections, adopted the calculations in the PSR, and imposed a sentence of life imprisonment, with an additional ten years' imprisonment to be served consecutively.

II.

Colbert appeals his convictions, arguing that the evidence derived from the wiretap and the search of the Hillcrest Street house should have been suppressed, that Thompson's testimony about the search warrant executed at his house should have been admitted, that there was insufficient evidence to prove that he intended to shoot a federal agent, and that the firearm-related charges should have been severed from the conspiracy charges.

## A. The Motions to Suppress

"We review the district court's factual findings supporting the denial of [motions] to suppress for clear error and its legal determinations *de novo*." United States v. Garcia-Hernandez, 682 F.3d 767, 771 (8th Cir. 2012).

## 1. The Wiretap

Colbert argues that the wiretap evidence should have been suppressed, because the application and affidavit used to secure the wiretap failed to satisfy the necessity requirement set forth in 18 U.S.C. § 2518(1)(c), which provides that such an application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." This necessity requirement prevents the government from routinely using wiretaps "as the initial step in an investigation." United States v. Thompson, 210 F.3d 855, 858-59 (8th Cir. 2000) (quoting United States v. Maxwell, 25 F.3d 1389, 1394 (8th Cir. 1994)). But as we have repeatedly held, the necessity requirement does not mandate that the government "exhaust all possible techniques before applying for a wiretap." United States v. Macklin, 902 F.2d 1320, 1326-27 (8th Cir. 1990) ("The government is simply not required to use a wiretap only as a last resort."); see also United States v. Kahn, 415

U.S. 143, 153 n.12 (1974) (noting that the necessity requirement "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime"). A district court's determination that a wiretap is necessary constitutes a finding of fact, which is subject only to clear-error review. Thompson, 210 F.3d at 859.

The record belies Colbert's contention that the government had not attempted traditional surveillance techniques before seeking a wiretap. The affidavit supporting the application outlined several traditional investigative techniques the government employed with respect to Colbert, beginning no later than December 2010. These techniques included physical surveillance, information from two confidential witnesses, attempted controlled buys, and the installation of a pen register and trap-and-trace device on Colbert's cell phone. Moreover, the affidavit explained why those techniques were insufficient to gather evidence necessary to secure a conviction. For example, the government attempted a controlled buy using a cooperating witness on December 20, 2010, and attempted to conduct physical surveillance of that transaction. But, after contacting Colbert and Thompson, arranging to purchase a small quantity of crack cocaine, and going to Thompson's residence to buy the drugs, the witness could not complete the purchase because Thompson never opened his door and Colbert would not answer his phone. That same cooperating witness again attempted to conduct a controlled buy for the government on February 1, 2011, but Colbert denied having any drugs to sell. The affidavit stated that controlled buys would not be an effective investigative technique, because Colbert did not trust the government's cooperating witness and because no other cooperating witnesses had been identified.

Colbert argues that the timing of the wiretap application demonstrated that the government could not have attempted alternative investigative techniques and that the government's explanations for why certain techniques were infeasible lacked merit. An application need only establish that the government has attempted traditional

-8-

investigative techniques and demonstrate that those techniques are "insufficient to reveal the full conspiracy or the identity of" the conspirators. Thompson, 210 F.3d at 859. Colbert claims that the government's investigation of him did not begin until March 28, 2011, when the government first intercepted a phone call from Colbert's phone through the wiretap on another co-conspirator's phone, and that the only investigative technique attempted after that date was the pen register. But the government's affidavit shows that the investigation began well before March 28, when the government attempted the aforementioned controlled buys in December 2010 and February 2011.

Colbert also argues that the affidavit's use of boilerplate language did not satisfy the necessity requirement. An affidavit that explains "in general terms why some of the procedures have failed in other investigations and would likely fail in this case," satisfies § 2518(1)(c) if it contains "particular instances in which normal procedures were used and did in fact fail." Macklin, 902 F.2d at 1327. The affidavit's use of explanations that "are common to most drug conspiracy investigations . . . does not necessarily preclude a finding of necessity under section 2518(1)(c)." Thompson, 210 F.3d at 859 ("[A]lthough the affidavit's assertions of inadequacy 'might appear boilerplate, the fact that drug investigations suffer from common investigatory problems does not make these problems less vexing.'" (quoting United States v. Milton, 153 F.3d 891, 895 (8th Cir. 1998))). We conclude from our review of the affidavit that the district court did not clearly err in finding that the wiretap was necessary.

## 2. The Search Warrant

Colbert argues that the search-warrant application's failure to allege a nexus between the Hillcrest Street house and money laundering rendered it inadequate to establish probable cause. "[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue."

-9-

United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000). "The requisite nexus between a particular location and contraband is determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence." United States v. Etheridge, 165 F.3d 655, 657 (8th Cir. 1999). "[W]e accord substantial deference" to the district court's probable-cause determination, affirming as long as the court "had a 'substantial basis for concluding that probable cause existed.'" Garcia-Hernandez, 682 F.3d at 771 (quoting United States v. Buchanan, 574 F.3d 554, 561 (8th Cir. 2009)).

The affidavit included information provided by two witnesses, one who had engaged in transactions with Colbert in the past, and another who had been present when Colbert sold cocaine to other individuals. The affidavit also included intercepted phone calls in which Colbert used coded language to coordinate cocaine sales. The affidavit stated that Colbert owned several expensive cars, that he frequently wore expensive jewelry, and that he was in the process of renovating his primary residence, the Hillcrest Street house, but that he had not filed taxes in several years and had no apparent legitimate source of income. Although public records did not list Colbert or Davis as the owner of the house, the FBI determined that Colbert was the owner based on intercepted phone calls and the fact that he was renovating the house by, for example, adding granite counter tops and new fixtures in the kitchen and bathroom. It was reasonable to infer from those facts that the Hillcrest Street house itself and any improvements or jewelry located in the house were paid for with proceeds from Colbert's drug-trafficking business and that such evidence was likely to be located in the house. Those facts thus provided a substantial basis for the district court's conclusion that there was a reasonable likelihood that the government would find evidence of money laundering in the Hillcrest Street house.[3]

_____

[3]Colbert contends that the warrant was improperly granted, because although the application sought evidence of money laundering, he was not charged with money laundering, and many of the items listed on the warrant application were not found during the search. Nevertheless, probable cause that evidence of money laundering

Colbert argues in the alternative that, assuming that probable cause existed, the motion to suppress should have been granted because the warrant was based on stale information. "A warrant becomes stale if the information supporting the warrant is not 'sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search.'" United States v. Brewer, 588 F.3d 1165, 1173 (8th Cir. 2009) (quoting United States v. Palega, 556 F.3d 709, 715 (8th Cir. 2009)). "Important factors to consider in determining whether probable cause has dissipated . . . include the lapse of time since the warrant was issued, the nature of the criminal activity, and the kind of property subject to the search." Id. (quoting United States v. Gibson, 123 F.3d 1121, 1124 (8th Cir. 1997)). We conclude that the affidavit established the existence of an ongoing drug conspiracy from which Colbert was actively earning money, that police observed Colbert overseeing construction on his house less than three weeks before the warrant issued, and that Colbert resided at the Hillcrest Street house and kept his cars and personal property inside the house. In light of these circumstances, we conclude that the information used to establish probable case was not stale, and we hold that the district court did not err in denying the motion to suppress evidence derived from the search of the Hillcrest Street house.

## B. Thompson Testimony

Colbert argues that the district court abused its discretion by granting the government's motion to exclude certain testimony from Thompson. "We review the district court's evidentiary rulings for abuse of discretion." United States v. Lemons, 792 F.3d 941, 947 (8th Cir. 2015). As set forth earlier, the government moved to exclude Thompson's testimony as irrelevant. In granting the motion, the district court

---

would be present in the house existed at the time the warrant issued, and there is nothing to suggest that the warrant was a pretext for "general, exploratory rummaging." Cf. United States. v. Schmitz, 181 F.3d 981, 987-88 (8th Cir. 1999).

noted "the distinction between the amount of force or what happened in the two separate warrants" and the lack any of evidence that Thompson had communicated with Colbert at the time the warrants were served.

Colbert argues that Thompson's testimony about the search of his house was relevant to show that Colbert reasonably believed he was acting in self defense. Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). While "[t]he threshold for relevance is 'quite minimal,'" United States v. Holmes, 413 F.3d 770, 773 (8th Cir. 2005) (quoting United States v. Guerrero-Cortez, 110 F.3d 647, 652 (8th Cir. 1997)), we agree with the district court that the dissimilarity of the two events rendered the proposed testimony irrelevant. The tactics that the HRT used when they executed their no-knock warrant at Thompson's home were completely different from those used by SWAT at Colbert's home. Unlike the SWAT team, the HRT did not knock on Thompson's door, announce their presence, or shine bright lights into Thompson's windows before breaching his front door. The district court thus did not abuse its discretion in excluding Thompson's testimony.

## C. Misjoinder and Severability

Colbert argues that his conspiracy counts were misjoined with his firearm-related counts under Federal Rule of Criminal Procedure 8(a). "We review *de novo* a decision to join counts together into a single indictment." United States v. Midkiff, 614 F.3d 431, 439 (8th Cir. 2010). Rule 8(a) provides for the joinder of multiple offenses that "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Here, the charges were properly joined because all of the charges arose from the same act, Colbert's participation in a cocaine-distribution conspiracy. Specifically, the indictment charged Colbert with possession and discharge of a firearm in furtherance of the drug-trafficking conspiracy for which he was also charged in that indictment.

The remaining firearm-related offenses are in turn based on the same firearm as the possession-and-discharge offense. Joinder was therefore proper.

Joinder being proper, we turn to whether the district court erred in denying Colbert's severance motion. We review a district court's denial of a severance motion for abuse of discretion, and "we will reverse only when that abuse of discretion results in severe or clear prejudice." United States v. Robinson, 781 F.3d 453, 461 (8th Cir. 2015) (quoting United States v. Reynolds, 720 F.3d 665, 669 (8th Cir. 2013)); see also Fed. R. Crim. P. 14(a). No such prejudice exists "when evidence of the joined offense would be properly admissible in a separate trial for the other crime." Id. (quoting Reynolds, 720 F.3d at 670). Under the circumstances of this case, the same evidence would be admissible at trials for both the conspiracy and the firearm-related offenses. For example, the empty plastic bags containing cocaine residue that were recovered from the bathroom at the Hillcrest Street house would have been admissible as evidence of Colbert's involvement in the cocaine-distribution conspiracy at a trial for the conspiracy offenses and as evidence that Colbert was not acting in self defense at a trial for the firearm-related offenses. The district court thus did not abuse its discretion in denying the motion to sever.

D. Judgment of Acquittal

Colbert argues that the government failed to prove that he acted with the intent required to establish his conviction for assaulting a federal officer, 18 U.S.C. § 111. "We review the denial of a motion for a judgment of acquittal *de novo* but view the evidence in a light most favorable to the verdict." United States v. Paris, 816 F.3d 1037, 1038-39 (8th Cir. 2016). "We reverse only when no reasonable jury could have found the accused guilty." Id. at 1039.

We conclude that there was substantial evidence that Colbert was not acting in self defense when he fired on the SWAT team. The jury heard testimony from

-13-

Agent Cosenza regarding how loudly he knocked on Colbert's door and announced the FBI's presence; it viewed pictures of the dents left in the front door by Agent Cosenza's baton; and it heard testimony from other law-enforcement officials about the lights directed inside the house and the sheer curtains that only partially covered the windows. The jury also heard testimony that agents found kilogram-sized plastic bags containing cocaine residue in the toilet of the master bathroom near where Colbert's gun was found. It considered testimony from the FBI's firearms tool mark examiner, who mapped the trajectories of the bullets that Colbert fired and concluded that at least one bullet struck the door before it was opened. From this evidence, a reasonable jury could find that Colbert knew that the FBI was at his door, that he fired before the door was opened, and that he did so in order to buy the time necessary to allow him to destroy evidence. The district court thus properly denied Colbert's motion.

## III. Sentencing Issues

In reviewing Colbert's sentence, we "first ensure that the district court committed no significant procedural error," and we then determine whether the sentence imposed was substantively unreasonable. Gall v. United States, 552 U.S. 38, 51 (2007). "We review a district court's interpretation and application of the guidelines *de novo* and its factual findings regarding enhancements for clear error." United States v. Aguilar, 512 F.3d 485, 487 (8th Cir. 2008). Colbert argues that the district court procedurally erred by "selecting a sentence based on clearly erroneous facts," Gall, 552 U.S. at 51, when it calculated the drug quantity attributable to Colbert, see U.S.S.G. § 2D1.1(c), and when it applied the four-level organizer-or-leader enhancement, U.S.S.G. § 3B1.1(a).[4]

---

[4]Colbert also objected to the application of a 6-level enhancement for knowingly assaulting a police officer, U.S.S.G. § 3A1.2(c)(1), but that enhancement did not ultimately affect his sentence, and we see no error resulting from it.

Colbert argues that the district court relied on testimony from witnesses who were not credible in calculating the drug quantity attributable to Colbert. The court's drug-quantity calculation is a finding of fact that we review for clear error, reversing "only if the entire record definitely and firmly convinces us that a mistake has been made." United States v. Gonzalez-Rodriguez, 239 F.3d 948, 953 (8th Cir. 2001) (quoting United States v. Granados, 202 F.3d 1025, 1028 (8th Cir. 2000)).

The district court's drug-quantity calculation was based on the recordings of Colbert's intercepted phone calls that were played at trial and the trial testimony of three of Colbert's co-conspirators, Thompson, Edwards, and Long. Thompson testified that he had purchased two to three kilograms of cocaine from Colbert per week, totaling between 168 and 252 kilograms of cocaine in 2010 and 2011. Edwards testified that he had purchased between four and one-half ounces and nine ounces of cocaine from Colbert two to four times per week and converted approximately four ounces out of every nine ounces into crack, which amounted to a total of forty-nine kilograms of cocaine, of which twenty-one kilograms had been converted to crack over the relevant period. Long testified that he had facilitated meetings between Colbert and Mexican drug suppliers, that he had received approximately $500 per kilogram that Colbert purchased at these transactions, and that he had profited $100,000 from facilitating the sale of at least 200 kilograms of cocaine between 2010 and October 2011.

Colbert asserts that none of these witnesses was credible. He notes that Long had previously lied to the FBI about his role in the conspiracy and the amount of cocaine he had purchased, and that Thompson's testimony was inconsistent because he claimed at one point to have purchased two to three kilograms per week, but also claimed that he had purchased only between twenty and forty kilograms over the relevant period. The district court acted within its broad discretion when it in credited Long's testimony and when it credited the greater amount of cocaine that Thompson claimed in his testimony. See United States v. Jackson, 782 F.3d 1006, 1014 (8th

-15-

Cir.), cert. denied sub nom. O'Bryant v. United States, 136 S. Ct. 501 (2015). We thus conclude that the district court did not clearly err in making its drug-quantity calculation.

Colbert next argues that the 4-level organizer-or-leader enhancement under U.S.S.G. § 3B1.1(a) was not supported by the record because he did not exercise any control or decision-making authority over his co-conspirators. We disagree. We broadly interpret the terms "organizer" and "leader" under § 3B1.1(a). United States v. Morris, 791 F.3d 910, 914 (8th Cir. 2015). "Although an individual in a drug conspiracy must do more than sell drugs for resale in order to be deemed an organizer or leader, he need not directly control his co-conspirators." Id. (quoting Thompson, 210 F.3d at 861). The trial testimony and recorded phone conversations indicate that Colbert instructed his sister, Antoinette Colbert, to deliver cocaine on his behalf, and on at least one occasion ordered Thompson to conduct a sale on his behalf, with Thompson receiving no compensation for doing so. Moreover, Colbert was a high-volume distributor with several customers, some of whom purchased cocaine on credit. The district court did not clearly err in finding that Colbert was a leader or organizer of the conspiracy. See id.

Having found no procedural error, we next determine whether the sentence imposed was substantively reasonable, a question we review under a deferential abuse-of-discretion standard, considering the totality of the circumstances. United States v. Feemster, 572 F.3d 455, 461 (8th Cir. 2009) (en banc). "If the defendant's sentence is within the Guidelines range, then we 'may, but [are] not required to, apply a presumption of reasonableness.'" Id. (alterations in original) (quoting Gall, 552 U.S. at 51). The district court abuses its discretion if "it fails to consider a relevant factor, gives significant weight to an irrelevant or improper factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case." United States v. San-Miguel, 634 F.3d 471, 475 (8th Cir. 2011) (quoting

United States v. Jones, 509 F.3d 911, 913 (8th Cir. 2007)).  Colbert does not claim that the district court considered irrelevant or improper factors, and we conclude that the district court did not commit a clear error of judgment.

The district court properly considered the relevant § 3553(a) factors, noting that the sentence was appropriate in light of "the seriousness of the offense," that it was necessary "to promote respect for the law," that it ensured "just punishment for the offense," that it provided "an adequate deterrence . . . and protect[ed] the public from further crimes from this defendant," and that it reflected "Colbert's apparent complete lack of acceptance of responsibility for his criminal behavior."  The court considered Colbert's recitation of his claimed mitigating factors, and it did not commit a clear error of judgment by imposing a life sentence.

Colbert argues for the first time on appeal that a term-of-years sentence is necessary to avoid unwarranted sentence disparities, 18 U.S.C. § 3553(a)(6), noting that Bobby Banks, a defendant in another case, was convicted of similar crimes and was sentenced to fifty-five years' imprisonment, see United States v. Banks, 494 F.3d 681, 683 (8th Cir. 2007).  Although Banks also involved a conspiracy under 18 U.S.C. § 846, that case did not involve the firearm-related charges and the drug quantity present in this case.

Finally, Colbert argues that a sentence of life imprisonment constitutes cruel and unusual punishment in violation of the Eight Amendment to the United States Constitution, a challenge that we review by using the "'narrow proportionality principle' that 'applies to noncapital sentences.'" United States v. Wiest, 596 F.3d 906, 911 (8th Cir. 2010) (quoting Ewing v. California, 538 U.S. 11, 20 (2003)). Given the seriousness of Colbert's crimes, we conclude that a life sentence is not "grossly disproportionate" to his crime.  Id.

The judgment and sentence are affirmed.

———————————————————